UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATHANIEL H. BRENT,

           Plaintiff,

                                          Case number 11-10724
v.                                      Honorable Julian Abele Cook, Jr.

WAYNE COUNTY DEPARTMENT OF HUMAN
SERVICES, et al.,

                    Defendants.

ORDER

      In this civil rights action brought pursuant to 42 U.S.C. § 1983, the *pro se* Plaintiff,

Nathaniel H. Brent, alleges that those individuals and entities who have been identified by him as

Defendants[1] are responsible for a multitude of violations of federal and Michigan law, all of which

have had an adverse impact upon him.

---

      [1]Brent has identified the following persons and entities as Defendants: (1) the State of
Michigan and the Wayne County Departments of Human Services ("DHS"); (2) current and
former employees of the Wayne County DHS Child Protection and Foster Care Departments
(Mia Wenk, Shevonne Trice, Heather Decormier-McFarland, Monica Sampson, Charlotte
McGehee, and Joyce Lamar); (3) agencies under contract with the Wayne County DHS
(Methodist Children's Home, Judson Center, and Children's Center of Wayne County); (4) an
employee of the Judson Center (Wendolyn Greene); (5) the Detroit Police Department ("DPD");
and (6) law enforcement personnel within the Detroit Police Department (Officers Emina
Biogradlija and Michael Bronson, as well as unnamed John/Jane Doe officers). The Court has
previously dismissed Brent's claims as they relate to six other Defendants (Noel Chinavare and
Michael Chinavare (temporary guardian appointees of Brent's male children) and Wayne County
Family Court judges and referees (Judy Hartsfield, Leslie Smith, Anthony Crutchfield, and
Nicolas Bobak)); this order is the subject of a pending motion for reconsideration. The entities
and individuals who have been identified in the above-listed categories (1) and (2) are
collectively referred to hereinafter as the "State Defendants."

Currently before the Court are two motions that have been filed by Brent; namely (1) a motion for reconsideration of an order in which some of the originally identified Defendants were dismissed as litigants; and (2) a motion to file supplemental authority. Also pending are four dispositive motions that have been submitted to the Court for its consideration by the following Defendants: (1) the State Defendants; (2) the Methodist Children's Home; (3) the Judson Center and its employee, Wendolyn Greene; and (4) the Children's Center of Wayne County ("Children's Center").[2]

## I.  Factual and Procedural Background[3]

Brent is the father of five minor children - three boys (ALB, RAB, and JAB), and two girls, (SAB and JAB). On January 17, 2010, RAB, then fifteen, left his home and arrived at a Detroit Police station barefoot and wearing only a pair of shorts. DPD Officer Donald Coleman (not a party to this case) submitted a report to the DHS regarding RAB's having run away from home. RAB returned to his home on the same evening.

In Brent's initial pleadings, he contends that Coleman effectively withdrew the complaint to the DHS, having advised DHS employee Mia Wenk that RAB had run away from his home as a result of his own poor decision-making. Notwithstanding, Brent asserts that Wenk completely disregarded Coleman's representations and initiated an investigation. Wenk visited his home on

---

[2]With the exception of the Detroit Police Department and its named and unnamed employees, these motions account for all of the remaining Defendants in this case.

[3]The Court will set out the basic chronological facts here, but will reserve for later discussion more specific allegations as they relate to each Defendant and their respective defenses.

January 20th and 21st, and thereafter made a referral of the Brent family to the Judson Center[4] on February 16th. That same day, Brent's name was placed on Michigan's Central Registry for "physical neglect."

On February 18th, a petition to remove the children from the Brent home was filed with, and granted by, the Family Division of the Third Judicial Circuit Court for Wayne County ("Family Court"). That evening, DPD officers removed all five of the Brent children from their home. The female children were placed in the Davenport emergency shelter, and the male children were placed in the Wolverine emergency shelter.[5] During a preliminary hearing before Referee Nicolas Bobak the following day, guardians ad litem and counsel were appointed for the Brent parents.[6] Six days later (February 24th), the family court conducted a probable cause hearing, and probable cause was found to authorize the petition of removal.

On March 3rd, DHS employee Mia Trice placed the male children with Noel and Michael Chinavare and the female children with Wendy and Thomas Chinchak (not parties to this litigation). Brent states that Trice gave the Chinavares a document that claimed that they were the temporary guardians of the male children. Trice inspected the Brent home on March 10th, and deemed it to be a suitable home for the children. A pretrial hearing was held on March 12th before Referee Anthony Crutchfield, and additional pretrial hearings were held on March 23rd and 30th

_____

[4]The Judson Center is a human services agency in Michigan with six regional offices throughout the State.

[5]One male child, JAB, was first taken to the hospital for an evaluation, but was subsequently placed with his brothers at Wolverine.

[6]The order memorializing this hearing indicates that guardians ad litem were appointed for the parents because they exhibited what Bobak thought to be "unusual behavior throughout the court hearing."

3

before Judge Judy Hartsfield. On March 26th, all of the children were removed from their respective placements and returned to the emergency shelters. The male children were subsequently placed at Methodist Children's Home on April 5th, whereas the female children were placed in a foster home on April 28th under the supervision of the Children's Center of Wayne County.

Subsequent pretrial hearings were held on May 3rd and May 10th. Guardians ad litem were appointed for each parent. A jury trial was conducted on May 11th, 12th, and 13th, with the jury eventually finding that one or more statutory grounds existed for the Family Court to exercise jurisdiction over the children. After a dispositional hearing on June 2nd, the children were released to their parents, along with a directive that they remain under the supervision of the DHS.[7] On September 10th, upon finding that (1) the Brents had improved the conditions within their home and cooperated in receiving services, and (2) the children's needs were being met, the jurisdiction of the Family Court was terminated.

Feeling aggrieved by these circumstances, Brent commenced this lawsuit on February 22, 2011. He subsequently filed an amended complaint which, as it pertains to the Michigan DHS, seeks (1) a declaration that certain statutes and policies are unconstitutional facially and/or as applied to him; (2) injunctive relief which would prohibit further enforcement of these provisions; (3) a declaration that the procedures by which he was placed on the Central Registry were unconstitutional facially and/or as applied to him; and (4) a directive that would require his name

---

[7] On June 21st, Brent filed an appeal in the Michigan Court of Appeals of the Family Court order that had asserted jurisdiction over his children. However, his appeal was unsuccessful, as were three subsequent motions for reconsideration. This Court takes judicial notice of additional events with respect to that case: to wit, the Michigan Supreme Court denied Brent's application for leave to appeal and his subsequent motion for reconsideration. *See Rodic v. Thistledown Racing Club, Inc.*, 615 F.2d 736, 738 (6th Cir. 1980) ("Federal courts may take judicial notice of proceedings in other courts of record." (citation omitted)).

to be removed from the Central Registry.

With regard to the remaining Defendants, he alleged, against various sub-groups of the Defendants, (1) several claims pursuant to 42 U.S.C. § 1983 for their interference with his rights, as guaranteed by the First, Second, Fourth, Ninth, and Fourteenth Amendments to the United States Constitution; (2) conspiracy to deprive him of his constitutional rights and conspiracy to retaliate against him for exercising those rights pursuant to 42 U.S.C. § 1985; (3) failure to prevent the violation of his constitutional rights pursuant to 42 U.S.C. § 1986; (4) gross negligence; (5) intentional infliction of emotional distress; and (6) a claim for failure to report medical neglect as required by Mich. Comp. Laws § 722.633(1).

## II. Motion for Reconsideration

The Court will initially address Brent's motion for reconsideration of an order of November 28, 2011, which, in pertinent part, granted (1) the State Defendants' motion to dismiss with respect to the Judicial Defendants; (2) the Chinavares' motion for summary judgment; and (3) Brent's motion to file an amended complaint regarding the remaining Defendants. (*See* Order, Nov. 28, 2011, ECF 113 ("Order")). Brent's pending motion challenges the first and second of those rulings.

### A.    Standard of Review

The Local Rules of the Eastern District of Michigan require a party who seeks reconsideration of an order to (1) establish the existence of "a palpable defect by which the court and the parties and other persons entitled to be heard on the motion have been misled"; and (2) "show that correcting the defect will result in a different disposition of the case." E.D. Mich. LR 7.1(h)(3). A palpable defect is one that is "is obvious, clear, unmistakable, manifest, or plain." *Chrysler Realty Co., LLC v. Design Forum Architects, Inc.*, 544 F. Supp. 2d 609, 618 (E.D. Mich.

2008) (citation omitted). Furthermore, "the court will not grant motions for rehearing or reconsideration that merely present the same issues ruled upon by the court, either expressly or by reasonable implication." E.D. Mich. LR 7.1(h)(3).

B.      Allegations of Factual Error

Brent argues that the Court made two factual errors in its ruling. His first allegation of error relates to the following passage:

> On February 18, a preliminary hearing was held before Referee Bobak, and the court issued an order to take the children into protective custody. That evening, all five children were removed from the home by DPD officers and placed into emergency shelters. At a preliminary hearing the following day, guardians at litem and counsel were appointed for the parents.

(Order at 3). Brent states that a petition for removal was filed and the order to place his children under protective custody was issued on February 18th, but that no preliminary hearing was conducted until the following day. He states that the removal order was "rubber stamped" with Judge Smith's name by a probation officer.[8] Brent is correct that the Court erred with respect to the date of the preliminary hearing, and, to that extent, it amends its prior order. However, the Michigan Court Rules expressly contemplate that, barring certain circumstances not present here, the preliminary hearing must take place within twenty-four hours after the child is taken into protective custody. Mich. Ct. Rule 3.965(A)(1). There is no allegation that this action did not occur here.

Brent's second allegation of factual error relates to the following passage:

> Brent does not allege - indeed, he cannot contend - that providing housing to children under a temporary guardianship arrangement is the exercise of an exclusive

---

[8]The Court will leave consideration of this allegation for its analysis of Brent's more general assault on the procedures that were employed by the Family Court.

> state function. *Cf. Reguli*, 371 F. App'x at 600 (providing court-ordered services to
> teenagers is not a power traditionally reserved exclusively to the state).

(Order at 20). Brent submits that the Court committed an error when it suggested that the child in

question was a teenager, when in fact he was eleven years old.[9] However, the Court made no such

suggestion. On the contrary, the use of the signal "*cf.*" indicates that the cited authority supports

a proposition different than, but sufficiently analogous to, the main assertion (here, that providing

housing to children under a temporary guardianship arrangement is not an exclusive state function).

The citation to an analogous, but different, situation dealing with teenagers and court-ordered

services does not "suggest" that the child in question was a teenager.[10] The Court did not commit

any error.

C.   <u>Dismissal of the Judicial Defendants</u>

Brent also raises several objections to the application of the *Rooker-Feldman* doctrine by

the Court as it applies to the Judicial Defendants. *See Exxon Mobil Corp. v. Saudi Basic Indus.*

*Corp.*, 544 U.S. 280, 284 (2005) (describing scope of *Rooker-Feldman* doctrine and reaffirming

that it is distinct from preclusion and abstention doctrines). His first argument is that all of the

Family Court orders that had been executed prior to the entry of the final order which terminated

jurisdiction were rendered mood, inasmuch as they had already been executed and terminated.

Thus, he believes that these orders are no longer binding by virtue of the termination of jurisdiction

over the minors by the Family Court. However, he has presented no authority that creates an

---

[9]Brent has not specified where in the order the Court purportedly made this suggestion, but the Court assumes that this - the only passage in which the word "teenager" appears - is the relevant passage.

[10]The challenged passage plainly relates to all three male children who were placed with the Chinavares, two of whom were teenagers at the time.

exception to the application of the *Rooker-Feldman* doctrine simply because the state court has terminated its jurisdiction over the matter.

His second, related argument is a contention which this Court has previously addressed and rejected; namely, that, inasmuch as the only final order in this matter was the directive which terminated the jurisdiction of the Family Court, he cannot be deemed to be a "state court loser" who seeks relief from that order. Brent misinterprets the scope of the *Rooker-Feldman* doctrine. It does not apply exclusively to the final judgment which terminates a state-court proceeding. Rather, as in the case that was relied upon by the Court in its now-challenged order, *see Reguli v. Guffee*, 371 F. App'x 590, 595-96 (6th Cir. 2010), the *Rooker-Feldman* doctrine precludes a federal district court from reviewing the orders entered and the decisions made by a state court throughout the pendency of the litigation in that forum. Indeed, the district court ruling in *Reguli* - which was affirmed by the Sixth Circuit - rejected an argument nearly identical to the one Brent now presents. *See Reguli v. Guffee*, No. 3:08-0774, 2009 WL 425020, at *9 (M.D. Tenn. Feb. 19, 2009) ("Plaintiff argues that *Rooker-Feldman* would bar only challenges to the Juvenile Court's finding that [her daughter] was 'unruly.' The Juvenile Court's Orders included far more than simply a finding of unruliness, however. The alleged illegal actions of [the defendant] all arise from her orders as Juvenile Court Referee, even if they were not the ultimate adjudication of 'unruly.'" (citations omitted)).

Brent raises a similar argument - also rejected by the Court in its prior order - that the *Rooker-Feldman* doctrine does not apply because his appeal of the Family Court order was still pending. In the now-challenged order, the Court noted that the applicability of the *Rooker-Feldman* doctrine does not depend upon the outcome of the state-court appeal because "[t]he orders about

8

which Brent complains were rendered before the proceedings were commenced in this Court. Regardless of whether the state appellate court reverses or upholds those determinations, this Court lacks jurisdiction to consider them. Indeed, in *Reguli*, the Sixth Circuit found that *Rooker-Feldman* precluded district court review of the orders rendered by a juvenile court referee, notwithstanding that the plaintiff had filed an appeal of those orders three weeks before filing her federal complaint." (Order at 15 n.8). Brent has not presented any basis for the Court to conclude that *Reguli* is distinguishable here.

Brent next attempts to avoid the application of the *Rooker-Feldman* doctrine by arguing that he is challenging not the orders themselves, but only the processes and procedures by which they were obtained. It is his view that his constitutional rights were violated by the proceedings from which the orders resulted. For example, he alleges multiple due process violations based upon the Judicial Defendants' alleged (1) refusal to consider a motion that he had filed; (2) fabrication of evidence and tampering with witnesses; and (3) denial of his rights to self-representation and to question and call witnesses.

However, a litigant cannot simply recast a judicial decision or order as a "practice" or a "policy" and thereby evade the *Rooker-Feldman* doctrine. Furthermore, the Sixth Circuit has held that due process challenges to the manner in which a state proceeding was conducted fall within the sweep of the *Rooker-Feldman* doctrine. In resolving *In re Cook*, the Sixth Circuit held that the *Rooker-Feldman* doctrine barred federal court review of an attorney's claim that state disbarment proceedings were conducted in such a way as to deny her right to due process. 551 F.3d 542, 567-48 (6th Cir. 2009). ("[Plaintiff] devotes a substantial portion of her argument to challenging the sufficiency of the due process protections she was afforded in her state disbarment proceedings,

seemingly challenging the validity of the Supreme Court of Ohio's disbarment order. However, this Court is precluded by the *Rooker-Feldman* doctrine from reviewing any claims that challenge the sufficiency of the proceedings afforded [her] by the State of Ohio. . . ."); *id.* at 548 ("[T]he *Rooker-Feldman* doctrine . . . precludes review of any claims arising directly out of [the] state disbarment proceedings or the Ohio Supreme Court's disbarment order."); *see also Wallis v. Fifth Third Bank*, 443 F. App'x 202, 204-05 (7th Cir. 2011) (where plaintiff alleged that "the state-court judge violated his civil rights and his right to due process by conspiring with [defendant and others] . . . , [he] cannot circumvent the *Rooker-Feldman* doctrine by recasting a request for the district court to review state-court rulings as a complaint about civil rights, due process, conspiracy, or RICO violations"); *Catudal v. Browne*, No. 2:12-CV00197, 2012 WL 1068530, at *2-3 (S.D. Ohio Mar. 29, 2012) (plaintiff's claims against state judicial officers in divorce and custody proceedings barred by *Rooker-Feldman* doctrine because, although he "attempts to frame his action as a civil rights action under § 1983, frequently contending, in conclusory fashion, that the judicial Defendants have violated his equal protection and due process rights . . . , [a] fair reading of [the complaint] . . . reveals that he is actually challenging the various rulings of the judicial [d]efendants, which ultimately resulted in the October 19, 2011 divorce decree denying him legal custody over his daughter"); *Haller v. Lipps*, No. 1:11-cv-291, 2011 WL 7300284, at *5 (S.D. Ohio Dec. 28, 2011), *adopted by* 2012 WL 479083 (S.D. Ohio Feb. 14, 2012), *aff'd* No. 12-3240 (6th Cir. Aug. 22, 2012) (claims that state judges denied plaintiff due process and equal protection in adjudicating child custody and harassment cases by suppressing evidence, ignoring facts and applicable law, and refusing to conduct evidentiary hearing were barred by *Rooker-Feldman* doctrine, notwithstanding plaintiff's claim that he was not seeking reconsideration of state court

orders, because "the injuries alleged all stem from the result of his state court proceedings and his request for relief is predicated on a determination that the [j]udicial [d]efendants improperly adjudicated the matters").

Brent relies upon *Catz v. Chalker*, 142 F.3d 279 (6th Cir. 1998), *overruled on other grounds as stated in Coles v. Granville*, 448 F.3d 853, 859 n.1 (6th Cir. 2006), to argue that a challenge to state court procedures falls outside the scope of the *Rooker-Feldman* doctrine. However, *Catz* involved a situation wherein the plaintiff alleged that the defendants - his ex-wife and her attorneys - had procured orders from a state divorce court by various fraudulent and improper means. The fact situation therein is distinguishable from the case here, where Brent has challenged the adjudicative acts of the Judicial Defendants. The situation in *Catz* is comparable to this case *sub judice* as it pertains to the non-judicial Defendants. As noted in the now-challenged order, the *Rooker-Feldman* doctrine does not bar Brent's claims against the remaining Defendants, which allege injuries independent from the state court orders and thus are outside the scope of *Rooker-Feldman*. *See, e.g.*, *McCormick v. Braverman*, 451 F.3d 382, 393 (6th Cir. 2006) ("If the source of the injury is the state court decision, then the *Rooker-Feldman* doctrine would prevent the district court from asserting jurisdiction. If there is some other source of injury, such as a third party's actions, then the plaintiff asserts an independent claim."). Here, as in *Catz*, Brent's allegations against the non-judicial Defendants include claims that they procured orders from the Family Court by committing perjury, fabricating evidence, and otherwise misleading the state tribunal.[11]

---

[11]Brent also argues that the Court erred in deciding the *Rooker-Feldman* issue before allowing him to complete the discovery process. He claims that discovery would have yielded evidence of the various constitutional violations which had allegedly been committed by the Judicial Defendants. However, in this order, the Court has considered the factual allegations that he has subsequently raised regarding these Defendants, and the outcome would be no different if

Therefore, Brent's claims relating to the adjudication by the Judicial Defendants of the underlying case - with one possible exception that will be discussed below - are barred by the *Rooker-Feldman* doctrine.

In any event, to the extent - if at all - that any of Brent's claims for damages against the Judicial Defendants fall outside the scope of the *Rooker-Feldman* doctrine, any attempt to hold them personally liable[12] in this civil rights action would still be barred because they are entitled to absolute judicial immunity for the complained-of acts.[13] "Like other forms of official immunity, judicial immunity is an immunity from suit, not just from ultimate assessment of damages." *Mireles v. Waco*, 502 U.S. 9, 11 (1991).

Judicial immunity is not overcome by allegations that the defendant acted corruptly, maliciously, or in bad faith. *Id.* (citing cases). "Rather, our cases make clear that the immunity is overcome in only two sets of circumstances. First, a judge is not immune from liability for nonjudicial actions, *i.e.*, actions not taken in the judge's judicial capacity. Second, a judge is not

---

he had provided evidence to support these allegations. Thus, the Court did not err in issuing its ruling prior to the commencement of discovery by Brent with respect to the Judicial Defendants.

[12]Any claims for damages against the Judicial Defendants in their official capacities are barred by Eleventh Amendment immunity. Neither Congress nor the State of Michigan has waived Michigan's Eleventh Amendment immunity from suits brought under 42 U.S.C. § 1983. *Kentucky v. Graham*, 473 U.S. 159, 169 n.17 (1985); *Johnson v. Unknown Dellatifa*, 357 F.3d 539, 545 (6th Cir. 2004). Official-capacity suits are, in reality, suits against the relevant office, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989), and state courts are agencies of the state, *see Pucci v. Nineteenth District Court*, 628 F.3d 752, 764 (6th Cir. 2010) ("The Nineteenth District Court (as with Michigan trial-level district courts generally) is entitled to the immunity protections of the Eleventh Amendment, and all federal claims against it must be dismissed."). The *Ex parte Young* exception permits suits for prospective injunctive and declaratory relief - but not for damages - against state officials in their official capacities. The Court will address the Eleventh Amendment in greater detail *infra* Part IV.D.

[13]As in the *Rooker-Feldman* doctrine analysis above, there is one allegation that is possibly outside the realm of judicial immunity - an exception that is discussed *infra*.

immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Id.* at 11-12 (citations omitted).

Brent submits that both exceptions to immunity are met here. First, he takes the position that the complained-of acts were not judicial in nature. The Supreme Court has articulated two factors that are relevant to a determination of whether an act is "judicial": first, "whether it is a function normally performed by a judge," and second, "whether [the parties] dealt with the judge in his judicial capacity." *Stump v. Sparkman*, 435 U.S. 349, 362 (1978). Both factors plainly support a finding that the acts about which Brent has complained were judicial in nature. Determinations about witnesses, representation, evidence, motions, and the like are all quintessentially "function[s] normally performed by a judge." At all times, Brent dealt with the Judicial Defendants in their capacities as judges and referees. Brent does not allege otherwise. Thus, the first exception to immunity is inapplicable here.

Second, Brent submits that the Judicial Defendants lacked proper jurisdiction, and therefore they cannot claim judicial immunity. However, he misapprehends the meaning of "complete absence of all jurisdiction." This phrase does *not* mean that judicial immunity is stripped whenever a judge acts in excess of his jurisdiction, *Stern v. Mascio*, 262 F.3d 600, 607 (6th Cir. 2001), or when a judge acted in error, *Stump*, 435 U.S. at 356-59 (judicial immunity applies even if a judge's "exercise of authority is flawed by the commission of grave procedural errors," and where the errors involve constitutional due process). Rather, "where jurisdiction over the subject-matter is invested by law in the judge, or in the court which he holds," he is entitled to judicial immunity for all of his judicial acts. *Stern*, 262 F.3d at 607 (quoting *Bradley v. Fisher*, 80 U.S. 335, 351-52 (1872)) (emphasis omitted). *Bradley* illustrated this distinction by comparing a situation in which

13

a probate judge - having jurisdiction only over wills and estates - tried a criminal case, in which case he would have acted in the clear absence of jurisdiction and judicial immunity would not attach, to a situation in which a judge of a criminal court convicted a defendant of a crime that did not exist, in which case he would have only acted in excess of his jurisdiction and immunity would attach. This is true "however erroneous the act may have been, and however injurious in its consequences it may have proved to the plaintiff." *Cleavinger v. Saxner*, 474 U.S. 193, 199-200 (1985) (citation and internal quotation marks omitted).

The proceedings here at issue were plainly within the jurisdiction of the Family Court division. Mich. Comp. Laws § 600.1021(1)(e) (family division of circuit court has sole and exclusive jurisdiction over "[c]ases involving juveniles as provided in chapter XIIA of the probate code of 1939, 1939 PA 288, Mich. Comp. Laws 712A.1 to 712A.32"). Brent cannot argue otherwise. His arguments that the Judicial Defendants wrongly exercised their jurisdiction or failed to adhere to the proper procedures in determining whether they had jurisdiction are arguments that the Judicial Defendants acted in excess of their jurisdiction, and thus - even if taken as true - are insufficient to strip them of judicial immunity.

Likewise, the Judicial Defendants are entitled to absolute immunity with respect to Brent's state law claims. Michigan law provides that a "judge, a legislator, and the elective or highest appointive executive official of all levels of government are immune from tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her judicial, legislative, or executive authority." Mich. Comp. Laws § 691.1407(5). The Court has already determined that the Judicial Defendants were, at all relevant times, acting within the scope of their judicial authority. Thus, Brent's state tort claims are also barred.

14

However, Brent makes one specific allegation that, arguably, may fall outside of the scope of the *Rooker-Feldman* doctrine and judicial immunity. He states that the initial petition to remove his children from their home was not reviewed by any judicial officer. Rather, he alleges that it is the policy of the Family Court to have probation agents - who are not lawyers and are not deputized as referees - "rubber stamp" removal petitions using a stamp which bears Judge Smith's name. This allegation is based on testimony from an unrelated case in which a Family Court employee testified as to certain court procedures, including the stamping by probation officers of Judge Smith's signature on removal petitions.[14] (*See* Tr. 8-10, *In the Matter of Godboldo-Hakim*, No. 11-499, 744 (Wayne Cnty. Cir. Ct., Family Div.), Copy at Ex. 1 to Pl.'s Supp. Br. in Opposition to State Defs.' Mot. to Dismiss, ECF 109)). However, the court there found nothing improper in the procedures under the applicable state laws and court rules.  (*Id.* at 58-61 (considering Mich. Ct. Rule 3.963 (allowing judge or referee to issue order authorizing designated persons to take children into protective custody "upon presentment of proofs"), and Mich. Comp. Laws § 712A.10 (permitting designation of probation officer or county agent as referee under certain circumstances)). On appeal, the Michigan Court of Appeals declined to address the merits of the plaintiffs' challenge to that procedure, noting that, "irrespective of any procedural invalidity pertaining to the . . . order to remove the child from her home, the circuit court possessed subject-matter jurisdiction over the child" because the petition had raised neglect allegations and a referee subsequently determined

---

[14]Brent appears to allege that this procedure applies to other types of orders in addition to the removal order. Thus, he challenges the orders that resulted from the preliminary and probable cause hearings in front of Referee Bobak. However, the testimony in the *Godboldo* case - even if this Court could assume that the procedures testified to there were also followed with respect to the Brent children - is limited to the orders resulting from the removal petition. The Court finds no basis to conclude that this procedure also applies to orders that were issued - as Brent concedes - after hearings in front of referees.

15

that probable cause of neglect existed.[15] *In the Matter of A. Godboldo-Hakim*, Nos. 305858, 308040 (Mich. Ct. App. July 17, 2012). The same is true here. Thus, even assuming that this testimony from an unrelated case is relevant to the issues in this case, and even assuming the complained-of procedure falls outside the scope of the judicial immunity and *Rooker-Feldman* doctrines, the Court finds no basis to conclude that this allegation in any way supports Brent's claims against the Judicial Defendants.

Brent argues that the Court erred when it dismissed the Judicial Defendants without giving him an opportunity to amend his complaint. However, the Court has considered all of the factual allegations against these Judicial Defendants that were raised by Brent in his motion for reconsideration, and has determined that none of them would alter the outcome of the now-challenged order. Thus, any proposed amendment would have been futile. *See Foman v. Davis*, 371 U.S. 178, 181 (1962) (futility of proposed amendment justifies denial of motion to amend).

D.   Dismissal of Michael and Noel Chinavare

Turning now to the dismissal of Michael and Noel Chinavare, Brent maintains that the Court erred in (1) determining they were not state actors and (2) dismissing them without allowing him to amend his complaint to include a count under 42 U.S.C. § 1985 for conspiring to deny him of his constitutional rights. The Court rejects both arguments.

As to his first contention, Brent's motion for reconsideration rests on the same arguments that he previously made and the Court previously rejected. *See* E.D. Mich. LR 7.1(h)(3). He asserts

_____

[15]Brent briefly argues, on the basis of *In re AMB*, 640 N.W.2d 262 (Mich. Ct. App. 2001), that, under Michigan statutes and court rules, referees are not permitted to enter any orders for any purpose. However, the court rule that is now under discussion - Mich. Ct. Rule 3.963(B)(2) - expressly authorizes "the judge or referee" to issue a protective custody order upon making the requisite findings.

that the Chinavares were state actors because the DHS (1) placed the male Brent children in their care, and (2) provided them with an allegedly fraudulent document which stated that they were the guardians of these children. In the now-challenged order, the Court explained at length why these allegations failed to establish that the Chinavares were state actors under any of the relevant tests (*see* Order at 18-22), and Brent has failed to demonstrate that the determination was in error. At most, his motion for reconsideration further describes his claims against several of the State Defendants, but does nothing to establish that the Chinavares were state actors, nor does it point to any precedent in which temporary guardians or foster parents in similar circumstances were deemed to be state actors. Instead, Brent essentially simply expresses his disagreement with the ruling by this Court, which is an improper premise upon which to base a motion for reconsideration. *See Memminger v. O'Meara*, No. 11-14551, 2012 WL 694282, at *1 (E.D. Mich. Mar. 1, 2012). In summary, the Court did not err.

As to Brent's second argument, the Court determines that it did not commit any error when Brent was not permitted to amend his complaint to allege § 1985 claims against these Defendants because, as explained in greater detail *infra* Part IV.G, such an amendment would have been futile. *Foman*, 371 U.S. at 181.

For all of these reasons, Brent's motion for reconsideration is denied.

### III. Motion to File Supplemental Authority

The Court now turns to Brent's request to file an opinion of the Michigan Supreme Court that, he believes, directly relates to this case. None of the Defendants have expressed any opposition to this motion, and the opinion is a matter of public record. Perceiving no reason to exclude this authority, the Court grants Brent's motion.

## IV. Dispositive Motions

The Court now turns to the now-pending dispositive motions. Because many of them involve the same factual and legal issues, the Court will consider them simultaneously.

A.    Standards of Review

When considering a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a district court must accept the plaintiff's well-pleaded allegations as true and construe each of them in a light that is most favorable to it. *Bennett v. MIS Corp.*, 607 F.3d 1076, 1091 (6th Cir. 2010). However, this assumption of truth does not extend to the plaintiff's legal conclusions because "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009). The complaint "must contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory." *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 519 (6th Cir. 2008) (citation and internal quotation marks omitted).

In order to survive an application for dismissal, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To meet this standard, the "plaintiff [must] plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. In essence, "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

In considering a 12(b)(6) motion, "documents attached to the pleadings become part of the pleading and may be considered." *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) (citing Fed. R. Civ. P. 10(c)). "In determining whether to grant a Rule

12(b)(6) motion, the court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001) (emphasis omitted)); *see also Barany-Snyder v. Weiner*, 539 F.3d 327, 332 (6th Cir. 2008) (applying *Amini*, 259 F.3d at 502, in the context of a Rule 12(c) motion (citation and internal quotation marks omitted)). Moreover, "documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claim." *Weiner, D.P.M. v. Klais & Co.*, 108 F.3d 86, 88 n.3 (6th Cir. 1997); *see also Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008). Supplemental documents attached to the motion to dismiss do not convert the pleading into one for summary judgment where the documents do not "rebut, challenge, or contradict anything in the plaintiff's complaint." *Song v. City of Elyria*, 985 F.2d 840, 842 (6th Cir. 1993) (citing *Watters v. Pelican Int'l, Inc.*, 706 F. Supp. 1452, 1457 n.1 (D. Colo. 1989)).

The purpose of the summary judgment rule, Federal Rule of Civil Procedure 56, "is to isolate and dispose of factually unsupportable claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Therefore, the entry of a summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When assessing a request for the entry of a summary judgment, the Court "must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party." *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987).

In order for a dispute to be genuine, it must contain evidence upon which a jury could find

19

in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 560 (6th Cir. 2004). Thus, the moving party has the initial obligation of identifying those portions of the record which demonstrate the absence of any genuine issue of a material fact. *Celotex*, 477 U.S. at 323. Thereafter, the nonmoving party must "come forward with some probative evidence to support its claim and make it necessary to resolve the differences at trial." *Boyd v. Ford Motor Co.*, 948 F.2d 283, 285 (6th Cir. 1991); *see also* Fed. R. Civ. P. 56(e)(2); *Anderson*, 477 U.S. at 256. The entry of a summary judgment is appropriate if the nonmoving party fails to present evidence which is "sufficient to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## B.   Collateral Estoppel

The State Defendants have revived their previously-rejected argument that Brent's claims are barred by the doctrine of collateral estoppel. The Court has ruled that Brent's claims are not collaterally estopped because he alleges that the Family Court's orders were obtained on the basis of misrepresentations and false testimony. *See Kolley*, 786 F. Supp. 2d at 1291. In such cases, it cannot be said that the previous litigation represented a "full and fair opportunity" to litigate the relevant issues. *Id.* The State Defendants now argue that Brent's accusations of false testimony should not preclude application of the collateral estoppel doctrine because those accusations are not supported by the record. The State Defendants argue that the record in this case conclusively proves that (1) the issues raised here have already been determined by the state court[16] and (2) false

---

[16]As proof of this statement, the State Defendants proffer several hundred pages of transcripts from various proceedings in the Family Court. Inasmuch as they have not made any effort to connect specific portions of the record to the particular claims which have been raised

testimony was not given. As to the first part of this argument, it is wholly unresponsive to the issue

of Brent's allegations of false testimony. As to the second part, it is important to note that discovery

has not proceeded in this case with respect to the State Defendants because the Court granted their

prior motion to stay discovery pending a resolution of their dispositive motions. Brent has provided

affidavits to support his argument that false testimony is given, and he is entitled to discovery to

further support his claims of false testimony. Any effort by the State Defendants to fault him for

his failure to provide more evidence to support those claims must be rejected at this point.

C.      State Actor Requirement Under § 1983

        Several of the Defendants - namely, Methodist Children's Home, Judson Center, Wendolyn

Greene, and the Children's Center[17] - argue that they cannot be considered as state actors for

purposes of imposing liability under 42 U.S.C. § 1983. In order to establish a claim under 42 U.S.C.

§ 1983, a plaintiff must set forth those facts that - when construed in his favor - clearly establish

"(1) the deprivation of a right secured by the Constitution or laws of the United States (2) [that has

been] caused by a person acting under the color of state law." *Sigley v. City of Parma Heights*, 437

F.3d 527, 533 (6th Cir. 2006) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)). For purposes of a §

---

by Brent, the Court declines their invitation to do so on their behalf.

        [17]In its dispositive motion, the Children's Center acquiesced in - without expressly
agreeing with - Brent's claim that it should be deemed a state actor for present purposes, and
instead focused its argument on its assertion of various forms of immunity. However, during oral
arguments, the Children's Center asserted the argument that it - just as with these other
Defendants - is not a state actor. Because it is a plaintiff's burden to establish that a defendant is
a state actor, rather than a defendant's affirmative burden to argue in avoidance, *see, e.g.*,
*Wolotsky v. Huhn*, 960 F.2d 1331 (6th Cir. 1992) (affirming grant of summary judgment in favor
of defendants because plaintiff could not establish that defendants were state actors under any of
the relevant tests), the Court will also examine whether the Children's Center should be deemed
to be a state actor, notwithstanding its initial acquiescence in Brent's characterization.

1983 claim, "[a] private party's actions constitute state action . . . where those actions may be 'fairly attributable to the state.'" *Chapman v. Higbee*, 319 F.3d 825, 833 (6th Cir. 2003) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 947 (1982)). The Sixth Circuit recognizes three tests to determine whether a private party may be considered to be a state actor: to wit, (1) the public function test; (2) the state compulsion test; and (3) the nexus test. *Id.*

"Under the public function test, a private party is deemed [to be] a state actor if he or she exercised powers traditionally reserved exclusively to the state." *Id.* This test has been interpreted narrowly, and has only been found applicable for such functions as holding elections, exercising eminent domain, and operating a company-owned town. *Id.* at 833-34 (citations omitted). Under this test, "the [c]ourt conducts a historical analysis to determine whether the party has engaged in an action traditionally reserved to the state, and the plaintiff bears the burden of making that showing." *Reguli*, 371 F. App'x at 600 (citation and internal quotation marks omitted); *see also Wittstock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003) ("When considering whether private action should be attributed to the state under the public function test, the court conducts a historical analysis to determine whether the party has engaged in an action traditionally reserved to the state, and the plaintiff bears the burden of making that showing.").

"The state compulsion test requires that a state exercise such coercive power or provide such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state." *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992) (citations omitted). It is insufficient that the state merely approved of or acquiesced in the private party's actions. *Id.* Rather, the plaintiff must "allege and prove that state officials coerced or participated" in the private party's decision-making. *Wilcher v. City of Akron*, 498 F.3d 516, 520 (6th Cir. 2007).

Finally, under the nexus test, "the action of a private party constitutes state action when there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself." *S.H.A.R.K. v. Metro Parks Serving Summit Co.*, 499 F.3d 553, 565 (6th Cir. 2007). To meet this burden, a plaintiff must "demonstrate[] that the state is intimately involved in the challenged private conduct." *Wolotsky*, 960 F.2d at 1335.

Because this "inquiry is fact-specific, and the presence of state action is determined on a case-by-case basis," *Chapman*, 319 F.3d at 834 (citation omitted), the Court will consider the relevant arguments that Brent has made with respect to each of these Defendants. Brent alleges that the Methodist Children's Home, Judson Center, and Greene should be deemed to be state actors under each of the three tests, although his arguments with respect to each test are somewhat overlapping.

At heart, Brent's main argument seems to be that, once the state intervened in his family affairs and removed his children from their home, all subsequent actions taken - by any entity - with respect to his children were necessarily done under color of state law. (*See* Pl.s' Resp. to Methodist's Mot. Dismiss at 10 ("Simply put, when the State decided to involve itself in Plaintiff's rights to the care, custody and control of his children, *all act* [sic] *as the result of that interference* are 'fairly attributable to the state[.]'" (emphasis added))). This argument is plainly inconsistent with relevant precedent, and Brent has provided absolutely no authority for this extraordinarily broad proposition.

In a similar vein, Brent argues that the public function test is satisfied because these Defendants provided services while his children were state detainees or because these services were

23

provided pursuant to a court order. Under this argument, every entity that provided services to temporarily-removed children, and every entity that provided court-ordered services, would be performing a public function. Brent neither presents any authority for this extremely broad proposition nor does he proffer any historical analysis upon which this Court can conclude that the provision of these services is a "power traditionally reserved exclusively to the state," *Chapman*, 319 F.3d at 833 - which is not surprising in light of the fact that the relevant precedent consistently holds to the contrary, *Reguli*, 371 F. App'x at 600 (providing court-ordered services to teenagers is not a power traditionally reserved exclusively to the state); *Molnar*, 574 F. Supp. 2d at 784 (provision of court-ordered counseling services is not public function). Similarly unavailing and unsupported is Brent's argument that, because the purpose of the Families First program is to meet the State's federal mandate to make reasonable efforts to prevent or eliminate the need to remove children from their homes, any entity providing Families First services is a state actor under the public function test. Again, Brent has provided no authority or historical analysis to support a conclusion that prevention of the removal of a child from a home was a "power traditionally reserved exclusively to the state," *Chapman*, 319 F.3d at 833, akin to holding an election or exercising eminent domain.

For this same reason, Brent's reliance on *West v. Atkins*, 487 U.S. 42 (1988), is misplaced. There, the Court held that, once a state incarcerates someone, it takes on an affirmative obligation under the Eighth Amendment not to treat that inmate with deliberate indifference - and, by extension, a contract physician providing health care services also takes on that obligation with respect to the inmates. *Id.* In *Lethbridge v. Lula Belle Stewart Center*, No. 06-14335, 2007 WL 2713733, at *3 (E.D. Mich. Sept. 17, 2007), the court noted that the Eighth Amendment cases

24

guided analysis of the state's substantive due process obligation to "ensure that minor children who become wards of the state by virtue of state action are not treated with deliberate indifference as to their health and safety." However, *Lethbridge* is distinguishable for at least three reasons. First, the plaintiffs in that case were the children themselves and not, as here, the parents of the children. Second, the § 1983 claim was premised on an alleged violation of the Eighth Amendment - the precise basis upon which *West* extended state action. And third, *Lethbridge* expressly distinguished a deliberate indifference context, where a claim against the care provider might lie, from the provision of "providing hands on, day-to-day care, which is not the state's obligation." *Id.* For this last proposition, the court cited *Leshko v. Servis*, 423 F.3d 337, 342 (3d Cir. 2005), in which the Third Circuit held that foster care providers were not state actors under any of the relevant tests, even though (1) Pennsylvania law considers "[a]ny person [including a foster parent] who is acting or who has acted on behalf of a governmental unit, whether on a permanent or temporary basis, whether compensated or not," to be a state employee; (2) the state comprehensively regulated foster care; and (3) the state and its counties funded the foster care agency. The court was careful to distinguish between traditional public functions, in which liability may inhere, and traditional public duties, in which liability does not necessarily attach. *Id.* at 345. Thus, while the state may have had a traditional duty to provide care for needy children, that duty was not a traditional and exclusive public function sufficient to satisfy the public function test. *Id.*; *see also Flagg Bros. v. Brooks*, 436 U.S. 149, 158 (1978) ("While many functions have been traditionally performed by governments, very few have been exclusively reserved to the State."). Thus, the Court is not persuaded that *West* and *Lethbridge* justify a finding of state action here with respect to any of these Defendants. *See Kolley*, 786 F. Supp. 2d at 1311-12 (distinguishing *Atkins* in holding that private

group home where plaintiff had been placed was not state actor under public function test).

Brent also relies on the non-binding Second Circuit opinion in *Perez v. Sugarman*, 499 F.2d 761 (2d Cir. 1974), to argue that, in accepting the placement of the Brent children, the Methodist Children's Home performed a public function.[18] Although the situation in *Perez* bears some similarities to the situation here - there, the plaintiff's children were removed by the city and placed with the defendant, a private child-caring facility - it is also distinguishable in significant ways - namely, that the defendant detained the children for over two years without the plaintiff's consent and, importantly, without the benefit of a court order or hearing. The Court also notes that the continued vitality of *Perez* is seriously in doubt, as the Supreme Court has significantly narrowly the previously-expansive view of state action in the years since the Warren Court. *See, e.g.*, *Phelan ex rel. Phelan v. Torres*, 843 F. Supp. 2d 259, 268-74 (E.D.N.Y. 2011) (describing evolution of state action doctrine and noting that "the Supreme Court has so dramatically changed the legal landscape in this area that [*Perez* is] arguably no longer good law"). The Court declines to follow this non-binding and quite possibly no-longer-valid analysis.

Brent also argues that the compulsion test is satisfied with respect to these Defendants because the placement at the Methodist Children's Home and the services provided by the Children's Center, the Judson Center, and Greene were forced upon him and his family by the State. (*See* Pl.'s Resp. to Methodist's Mot. Dismiss at 9 ("In determining whether or not [the Methodist Children's Home] was a state actor . . . the Court in reality needs to go no further than the fact that all of Plaintiff's and his family's involvement with [the Methodist Children's Home]

---

[18]This analysis also applies to Brent's claim, made during oral argument, that the Children's Center essentially became the state when it took on the care of state detainees.

was compelled by the state. There is absolutely nothing voluntary in the placement decisions or any act committed by [the Methodist Children's Home] after the children were placed. Plaintiff and his children were not free to choose a different placement or simply remove the children from [the Methodist Children's Home] due to the State's assumption of preliminary control of the children."); Pl.'s Resp. to Judson & Greene's Mot. Dismiss at 5 ("The last example of state compulsion is the simple fact that Plaintiff and his family would not have ever been involved with Families First, [the Family Reunification Program], or Greene absent Wayne DHS and the Family Court forcing them upon the family. Though this is not directly compelling the Defendants [sic] actions, it did force [them] upon the Plaintiff against his will.")) This argument misses the point entirely - the relevant inquiry is not whether he or his children were compelled to interact with these Defendants, but rather whether the actions and decisions taken by these Defendants were compelled by the State. The fact that he and his family did not voluntarily choose to become involved with these Defendants says nothing about the State's alleged compulsion of the Defendants. Thus, Brent's attempt to distinguish *Molnar v. Care House*, 574 F. Supp. 2d 772 (E.D. Mich. 2008) (private non-profit agency to which governmental entity referred minor child was not a state actor under any of the three tests), on the basis that the plaintiff there, unlike here, voluntarily became involved with the defendant is unavailing.

Brent next argues that the Judson Center and Greene satisfy the compulsion test because the existence of Families First and the Family Reunification Program relies exclusively upon referrals from county DHS agencies.[19] However forceful this argument may seem to be on its face,

---

[19]Brent also makes this argument with respect to the public function test. However, for the reasons outlined above, the Court rejects this assertion as a basis for concluding that the Judson Center engages in a traditional and exclusive public function.

relevant precedent makes clear that this sort of co-dependent relationship is an insufficient basis upon which to satisfy the nexus or compulsion test. *See Rendell-Baker v. Kohn*, 457 U.S. 830, 840-41 (1982) (school for maladjusted students was not state actor under any of the three tests, even though almost all of its income came from government funding, because "[a]cts of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts"). Similarly, Brent maintains that, inasmuch as these entities are licensed, monitored, and regulated by the state, they should be deemed to be state actors - a proposition that has been expressly and repeatedly rejected by the Sixth Circuit. *E.g.*, *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006) ("[O]ur precedent indicates that the mere fact that a hospital is licensed by the state is insufficient to transform it into a state actor for purposes of section 1983."); *Crowder v. Conlan*, 740 F.2d 447, 451 (6th Cir. 1984) ("State regulation of a private entity, even if it is 'extensive and detailed,' is not enough to support a finding of state action." (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 350 (1974))). For the same reasons, Brent's citation to specific State mandates (to wit, the requirement that all agencies which provide Families First services make contact with families within twenty-four hours of receiving a referral, or that Families First and Family Reunification Program providers report their findings back to the State) or DHS requirements (for example, that certain decisions or plans must be approved by DHS), or his more general reference to a set of program guidelines for all Families First providers - however extensive they may be - do not suffice to satisfy the compulsion or nexus test. While any contractual agency that provides services on behalf of the State necessarily must comply with certain requirements and mandates, it is clear that, at least in this case, the Methodist Children's Home, the Children's Center, the Judson Center, and Greene all retained significant discretion in

28

the rendering of their respective services and programs. Neither the Methodist Children's Home, the Children's Center, the Judson Center, nor Greene were so controlled by or intertwined with the State that their actions and decisions can be deemed to be those of the State under the relevant tests and precedent. *See Reguli*, 371 F. App'x at 600-02 (director of private youth counseling program that plaintiff's daughter was required by court to attend was not state actor under any test because (1) providing counseling was not exclusive state function; (2) there was no evidence that he was coerced by state in providing services or that state controlled his conduct to such extent as would make state responsible for it; and (3) state did not control his decisions or work). Therefore, the Court concludes that Brent cannot levy any claims based on § 1983 against these Defendants because he has not established that these private entities and individuals should be deemed to be state actors. Thus, the Court grants a summary judgment in favor of the Methodist Children's Home, the Children's Center, the Judson Center and Greene with respect to Brent's § 1983 claims.

D.     Eleventh Amendment Immunity

The Eleventh Amendment has been interpreted to "bar[ ] all suits, whether for injunctive, declaratory or monetary relief, against the state and its departments . . . by citizens of another state, foreigners or its own citizens," unless (1) the state has waived its immunity, or (2) Congress has abrogated it. *Thiokol Corp. v. Mich. Dep't of Treasury*, 987 F.2d 376, 381 (6th Cir. 1993) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100-01 (1984)). Neither exception applies in the instant case. "The state of Michigan . . . has not consented to being sued in civil rights actions in the federal courts," *Johnson v. Unknown Dellatifa*, 357 F.3d 539, 545 (6th Cir. 2004) (citation omitted), and  "Congress has not abrogated state sovereign immunity in suits under 42 U.S.C. § 1983," *Hutsell v. Sayre*, 5 F.3d 996, 999 (6th Cir. 1993) (citation omitted).

29

This immunity extends to the Michigan DHS (formerly known as the Family Independence Agency), which is a department of the State of Michigan. Mich. Comp. Laws § 400.1; *see also Kolley v. Adult Protective Services*, 786 F. Supp. 2d 1277, 1308 (E.D. Mich. 2011) ("This sovereign immunity extends to 'state instrumentalities,' like the Michigan Department of Human Services." (citing *Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997))); *Toliver v. Lutheran Social Servs.*, No. 07-14179, 2008 WL 126628 (E.D. Mich. Jan. 14, 2008) (dismissing Michigan DHS as being immune under Eleventh Amendment); *see also Fla. Dep't of Health & Rehabilitative Servs. v. Fla. Nursing Home Ass'n*, 450 U.S. 147 (1981) (Florida Department of Health and Rehabilitative Services, as a department of the state, enjoys Eleventh Amendment immunity). Therefore, Brent's claims against the Michigan DHS - in which he seeks to obtain declaratory and injunctive relief pursuant to § 1983 - are jurisdictionally barred, and a summary judgment must be, and is, entered in favor of the Michigan DHS.[20]

Brent resists this conclusion, arguing that the Eleventh Amendment does not bar suits for injunctive or declaratory relief against a state. He appears to be invoking the *Ex Parte Young* exception to Eleventh Amendment immunity. 209 U.S. 123 (1908). The *Ex Parte Young* doctrine provides a limited exception to the sovereign immunity bar, in that litigants may seek certain forms of relief by naming the relevant state officer, in his official capacity, as a defendant. *See Thiokol*, 987 F.2d at 381 (Eleventh Amendment "does not preclude actions against state officials sued in their official capacity for prospective injunctive or declaratory relief" (citing *Ex Parte Young*, 209 U.S. 123)). However, he has not named any appropriate state official, and his amended complaint

---

[20]Moreover, the State and its agencies are not "persons" within the meaning of § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989).

levies his requests for declaratory and injunctive relief solely against the Michigan DHS. Therefore, his contention that the Eleventh Amendment does not apply is unavailing. *See Kolley*, 786 F. Supp. 2d at 1308 (dismissing request for declaratory relief where only Michigan DHS, and not any appropriate state official, was named as defendant). If Brent desires to amend his complaint to identify a proper defendant for these claims, he must file a properly-supported motion for leave to amend for the consideration of this Court. *See* E.D. Mich. LR 15.1.

Brent also submits that Michigan waived its immunity when it enacted Mich. Comp. Laws § 600.6440 ("No claimant may be permitted to file claim in said court against the state nor any department, commission, board, institution, arm or agency thereof who has an adequate remedy upon his claim in the federal courts . . . ."). Brent misreads this statute. This provision provides for jurisdiction in the court of claims for suits against the state when the plaintiff would otherwise lack a remedy in the federal courts; however, it says nothing about whether the state has consented to suits in federal court. *See Lowery v. Dep't of Corr.*, 380 N.W.2d 99, 103 (Mich. Ct. App. 1985) ("[Section 600.6400] is not to be construed as a consent to a suit by a private citizen against the state."); *see also Abick v. State of Mich.*, 803 F.2d 874, 877 (6th Cir. 1986) (noting that the Sixth Circuit and Michigan state courts have held that § 600.6440 does not constitute waiver of Eleventh Amendment immunity); *Ewing v. Bd. of Regents of Univ. of Mich.*, 552 F. Supp. 881, 884 (E.D. Mich. 1982) ("Admitting the possibility that some causes of action might appropriately be brought in federal court against the state is not the same as a general waiver of immunity from suit in the federal courts."). Thus, this argument, too, must be rejected.

The State Defendants proclaim that Eleventh Amendment immunity extends to all of the State Defendants in their official capacities. Brent responds by asserting that the Eleventh

Amendment only extends to the state and "arms of the state," neither of which encompasses the Wayne County DHS and its employees. It is true that municipalities and municipal entities do not ordinarily enjoy Eleventh Amendment immunity. *Denton v. Bedinghaus*, 40 F. App'x 974, 978 (6th Cir. 2002) (unpublished) (citations omitted). It is also true that, "when acting on a particular issue or in a particular area, a local government official or entity may serve as an alter ego or arm of the state and, in that capacity, it may receive Eleventh Amendment protection." *Id.* (citations omitted). When determining whether a municipal entity is an arm of the state, courts look to such factors as "how state law defines the entity, what degree of control the state maintains over the entity, where the funds for the entity are derived, and who is responsible for judgment against the entity." *Gragg v. Ky. Cabinet for Workforce Development*, 289 F.3d 958, 963 (6th Cir. 2002) (citation and internal quotation marks omitted). Finally, "the entity asserting Eleventh Amendment immunity has the burden to show that it is entitled to immunity, *i.e.*, that it is an arm of the state." *Id.* Having presented no argument or evidence whatsoever with respect to these factors, the State Defendants (aside from the Michigan DHS) have not carried this burden. *See Toliver*, 2008 WL 126628, at *1-2 (Michigan DHS entitled to Eleventh Amendment immunity, but Wayne County DHS dismissed due to plaintiff's failure to establish *Monell* claim rather than on Eleventh Amendment immunity grounds). Therefore, the Court rejects their Eleventh Amendment argument as it applies to all persons and entities other than the Michigan DHS.[21]

E.   Absolute Immunity with Respect to § 1983 Claims

The individual State Defendants argue that they are entitled to absolute social worker

---

[21]It is important to note here that the determination of whether a municipal entity is "an arm of the state" is entirely distinct from the "state actor" requirement with respect to § 1983 claims.

immunity.[22] The Sixth Circuit has recognized that - by analogy to prosecutorial immunity - social workers are entitled to absolute immunity from § 1983 claims "when they are acting in their capacity as *legal advocates* - initiating court actions or testifying under oath - not when they are performing administrative, investigative, or other functions." *Holloway v. Brush*, 220 F.3d 767, 775 (6th Cir. 2000); *see also Kolley*, 786 F. Supp. 2d at 1305 ("[S]ocial workers who 'initiate judicial proceedings against those suspected of child abuse' or who otherwise function 'in roles intimately associated with the judicial phase of proceedings' receive absolute immunity." (quoting *Rippy ex rel. Rippy v. Hattaway*, 270 F.3d 416, 421 (6th Cir. 2001))). Thus, a social worker may be absolutely immune with respect to conduct that was "intimately associated with the judicial phase" of the process, *Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 640 F.3d 716, 724 (6th Cir. 2011) (citation and internal quotation marks omitted), and not with respect to conduct outside of that process.

The Sixth Circuit has rejected the argument that "social workers should and do enjoy absolute immunity whenever they undertake any act in what they regard as a child's best interest, [which would go] far beyond the traditional, prosecutorial, basis for such immunity and would

---

[22]The Children's Center, the Judson Center, and Greene have also raised the arguments that, if they are deemed to be state actors, each of them is entitled to absolute and/or qualified immunity. However, because the Court has already determined that they are not state actors, this argument need not be considered with respect to Brent's § 1983 claims. However, the Court notes that, in some instances, private actors who are deemed to be state actors for § 1983 purposes may assert these defenses. *See, e.g., Bartell v. Lohiser*, 215 F.3d 550, 556-57 (6th Cir. 2000) (private foster care contractor and social workers deemed to be state actors - a designation not challenged on appeal - permitted to assert qualified immunity because, *inter alia*, "the purposes of qualified immunity apply with particular force to the foster care services provided by [the defendants]"). These Defendants have also raised an absolute social worker immunity defense under Michigan law to Brent's state-law claims; the Court has considers this issue *infra* Part IV.H.

permit to go unredressed even the most blatant forms of discrimination or other constitutional violation." *Holloway*, 220 F.3d at 779. Thus, the Court must carefully examine the allegations to determine what role a social worker was performing at the time she engaged in the complained-of conduct. *See id.* at 776-77. While conduct related to the investigation of child abuse or neglect allegations is not shielded by absolute immunity, a plaintiff may not avoid the immunity bar by reframing claims that the defendant submitted false information to the court as claims that the defendant failed to conduct a proper or thorough investigation before submitting that information. *Pittman*, 640 F.3d at 727; *see also Rippy*, 270 F.3d at 421-22 (allegations that social workers' improper and incomplete investigation led them to incorporate false allegations into petition, and that they could have facilitated earlier return of child if they had performed proper post-removal investigation, were shielded by absolute immunity).

As long as the conduct in question is within the scope of absolute immunity, a social worker will be immune even if she made intentional misrepresentations to the court. *Pittman*, 640 F.3d 725-26 ("Whether [the social worker] made intentional misrepresentations to the juvenile court in the complaint and affidavits does not affect the conclusion that she is entitled to absolute immunity. . . . [P]rosecutorial immunity applies so long as the general nature of the action in question is part of the normal duties of a prosecutor, even when that immunity bar[s] § 1983 suits arising out of even unquestionably illegal or improper conduct by the prosecutor. . . . Because absolute immunity for social workers is akin to absolute immunity for prosecutors, the same protection must apply here, no matter how undesirable the results." (citations and internal quotation marks omitted)). Similarly, immunity is not defeated by an allegation that the social worker conspired with others to affect the outcome of the judicial proceedings. *Kolley*, 786 F. Supp. 2d at 1299 n.19 ("The fact

34

that the complaint alleges that [a social worker] 'conspired' with others regarding the testimony does not affect her entitlement to immunity. Likewise, the fact that the complaint alleges that her testimony was false does not affect her entitlement to immunity." (citations omitted)). However unfair or unjust it may seem to shield knowingly false - even illegal - conduct from liability, and "no matter how undesirable the results . . . , absolute immunity represents a balance between . . . evils [as it] has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." *Pittman*, 640 F.3d at 726 (citations and internal quotation marks omitted).

A review of Brent's complaint makes clear that, as it applies to the State Defendants, it alleges a mix of conduct that was and was not "intimately associated with the judicial phase" of the process. The alleged conduct that is protected by absolute immunity includes, at minimum, the preparation and submission of the removal petition to the Family Court - even if based on knowingly false information and even if based upon an improper or inadequate investigation, the execution of the resulting removal order, and the giving of recommendations and testimony - even if knowingly false - in the Family Court. (Am. Compl. ¶¶ VI.A.47-55, 57-60, 63, 70, 72, 76-78, 82-83; VII.A.32, 36; VIII.A.13; IX.A.32, 68-69). Thus, Brent cannot bring a § 1983 claims against these Defendants on the basis of these allegations.

The remainder of Brent's allegations against the individual state Defendants fall outside the scope of absolute social worker immunity. For example, a social worker's conduct in opening a case to investigate alleged child abuse or neglect or in placing a parent on the Central Registry are investigative and administrative in nature, and thus are not protected by absolute immunity. *See Achterhof v. Selvaggio*, 886 F.2d 826 (6th Cir. 1989); *see also Reguli*, 371 F. App'x 590, 598-99

35

(6th Cir. 2010) (unpublished) (distinguishing conduct within from without scope of absolute immunity).

F.    Qualified Immunity with Respect to § 1983 Claims

(1)    Individual Defendants[23]

The State Defendants contend that, to the extent that an absolute immunity defense is not available to them, they are entitled to an order of dismissal of Brent's claims under 42 U.S.C. § 1983 because they are shielded by qualified immunity. As noted above, to establish a claim under this statute, a plaintiff must set forth those facts that - when construed in his favor - clearly establish "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) [that has been] caused by a person acting under the color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).

The doctrine of qualified immunity generally protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Its purpose is "to shield the official from suit altogether, saving him or her from the burdens of discovery and costs of trial." *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

---

[23]The following analysis applies only to those claims brought against these Defendants in their individual capacities. Because claims against a person in his or her official capacity "generally represent only another way of pleading an action against an entity of which an officer is an agent," *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978); *see also Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985), the official-capacity allegations against these individuals will be subsumed within the analysis of the municipal liability claim against Wayne DHS.

36

This doctrine has also been described as a broad standard which is designed to protect "'all but the plainly incompetent or those who knowingly violate the law.'" *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "If *no* reasonably competent officer would have taken the same action, then qualified immunity should be denied; however, 'if officers of reasonable competence could disagree on [the legality of the action], immunity should be recognized.'" *Id.* (quoting *Malley*, 475 U.S. at 341).

"Once [this doctrine has been] raised, the plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity." *O'Malley v. Flint*, 652 F.3d 662, 667 (6th Cir. 2011). The Sixth Circuit has declared that a two-factor test should be applied to determine if a plaintiff can overcome an assertion of qualified immunity.[24] Thus, a defendant is entitled to qualified immunity unless a court determines that (1) the facts - when viewed in a light that is most favorable to the plaintiff - show that a constitutional violation has occurred;[25] and (2) the violation involved a clearly established constitutional right of which a reasonable person would have known.[26] *E.g.*, *Dominguez*, 555 F.3d at 549; *Phillips v. Roane Cnty.*, 534 F.3d 531, 538-39 (6th Cir. 2008).

----

[24]The Sixth Circuit has at time applied a three-factor test rather than the familiar two-factor test. *Compare Polk v. Hopkins*, 129 F. App'x 285, 288 (6th Cir. 2005) (applying three-factor test), *with Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009) (applying two-factor test). While neither test has been explicitly adopted in this Circuit, the more recent line of cases seems to suggest that the Sixth Circuit has preferred the two-factor test.

[25]Thus, a finding of a constitutional violation will simultaneously establish the first prong of Brent's § 1983 claim.

[26]Two years ago, the Supreme Court held in *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), that the lower courts now have the discretion to address the second factor first. In so doing, the Court overturned an earlier decision in *Saucier v. Katz*, 533 U.S. 194, 201 (2001), in which it specifically declared that the first and second factors must be analyzed in that order.

Brent's § 1983 claims against the individual State Defendants are based upon alleged violations of the Second, Fourth, and Fourteenth Amendments. The Court will consider each claimed basis in turn.

(a)    Second Amendment

Brent argues that his Second Amendment rights were violated when DHS workers included, among their reasons for finding the Brent home to be unsafe and unsuitable for the children, the fact that firearms and ammunition were located on a rack that was accessible to them and appeared to be unlocked. Brent has presented no authority for the proposition that the Second Amendment is violated when a social worker considers what appears to be unsafe storage of firearms in determining whether a home is safe for children. Moreover, even if such consideration did constitute such a violation, any such rule of law was not clearly established at the time of the events in question.

In 2008, the Supreme Court held that the Second Amendment protects an individual's right to possess firearms for the purpose of self-defense in the home. *District of Columbia v. Heller*, 554 U.S. 570 (2008). *Heller* expressly refrained from determining whether the Second Amendment applies to state, as opposed to federal, action.[27] *Id.* at 620 n.23. Two years later, in *McDonald v.*

_____

[27]Brent argues that, because *Heller* struck down a city law, it impliedly applied to all - not just federal - governmental bodies. However, the District of Columbia is not just like any other city. The Constitution establishes that Congress has plenary authority over the District of Columbia, U.S. Const. art I, § 8, cl. 17; *see also, e.g.*, *Palmore v. United States*, 411 U.S. 389, 395 (1973) ("A reference to 'state statutes' would ordinarily not include provisions of the District of Columbia Code, which was enacted, not by a state legislature, but by Congress, and which applies only within the boundaries of the District of Columbia. The District of Columbia is constitutionally distinct from the States." (citations omitted)); *Johnson v. Gov't of the Dist. of Columbia*, 584 F. Supp. 2d 83, 87 (D.D.C. 2008) ("The District of Columbia occupies a unique place in the United States, neither a State nor a Territory but the 'Seat of the Government of the

*City of Chicago*, 130 S. Ct. 3020 (2010), the Supreme Court, for the first time, answered that question in the affirmative. However, *McDonald* was issued after the events here in question. Indeed, the Brent children had been returned to their home, but were still under the jurisdiction of the Family Court, when *McDonald* was decided. Thus, the applicability of the Second Amendment to the states was not "clearly established" at the time of the actions which form the basis of this claim. Inasmuch as Brent cannot overcome their assertion of qualified immunity with respect to any claim that is premised on the Second Amendment, and because any additional discovery cannot remedy the fundamental defects of this claim, the individual State Defendants are entitled to a summary judgment on all such claims.

(b)     Fourth Amendment

The Court next turns to Brent's § 1983 claims based upon the Fourth Amendment. He asserts that his Fourth Amendment rights were violated when  (1) Mia Wenk went beyond the scope of the limited consent that had been given to her to enter the living room area of his home and question RAB to ensure that he had no medical problems arising from his exposure to the cold weather (January 20th visit); (2) Wenk demanded to be permitted to question RAB outside the presence of either parent (January 20th visit); (3) Wenk, Heather Decormier-McFarland, and Monica Sampson gained entry to his home by misrepresenting the purpose and intent of their visit (January 21st visit); (4) while Wenk kept the Brent parents preoccupied, and despite Brent's expressed objections, Sampson and Decormier-McFarland went throughout the home and

United States.' U.S. Const. art. I, § 8, cl. 17. The Constitution reserves to Congress the power "to exercise exclusive Legislation in all cases whatsoever over such District . . . . *Id.*"), and *Heller* made clear that it was not faced with, and thus was not ruling upon, the issue of whether the Second Amendment was incorporated against the states.

39

photographed the interior of his home (January 21st visit).[28]

The State Defendants insist that no Fourth Amendment violation occurred because they had consent to enter the home on each occasion. It is axiomatic that a warrantless entry into a private residence by a state actor[29] is presumptively unreasonable, subject to several carefully delineated exceptions. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2000). It is also well-settled that valid and voluntary consent given by an occupant with apparent authority to grant it constitutes an exception to the warrant requirement of the Fourth Amendment. *Florida v. Royer*, 460 U.S. 491, 497 (1983) (consent must be voluntarily given to vitiate warrant requirement); *United States v. Malock*, 415 U.S. 164, 171-72 (1974) (valid consent may be obtained from third party with common authority over premises); *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Brent concedes that both entries into his home were made with consent. However, he argues that the consent was (1) involuntary because it was obtained through deception and misrepresentation as to the purpose of the visits, and (2) limited in scope, and the State Defendants exceeded its boundaries. In support of this position, Brent has submitted his affidavit, as well as that of his wife, each of which clearly states both that the consent upon which these State Defendants relied was limited in scope and that Brent repeatedly objected when the limitations were exceeded. The State Defendants have not

---

[28]Brent also alleges a Fourth Amendment violation based upon the procurement of the order of removal without probable cause to believe that his children were at any risk of harm. However, as discussed above, the conduct of preparing and submitting a removal petition is within the scope of absolute social worker immunity.

[29]Although neither the Supreme Court nor the Sixth Circuit has explicitly held that the Fourth Amendment does not create a social worker exception, the Sixth Circuit has assumed that such an exception does not exist and that state actor social workers are subject to prohibitions of the Fourth Amendment. *See, e.g.*, *Jordan v. Murphy*, 145 F. App'x 513 (6th Cir. 2005) (assuming that no such exception exists, and noting that other circuits are in agreement).

responded to these claims.

Any consent that is obtained as the result of a ruse or misrepresentation may not be valid. *See, e.g.*, *United States v. Hardin*, 539 F.3d 404, 424-25 (6th Cir. 2008) (discussing when ruses, trickery, or misrepresentations invalidate consent). Moreover, even if the initial consent was valid, there is, at minimum, a genuine issue of a material fact as to whether the State Defendants exceeded the scope of the consent. "[E]ven when a search is authorized by consent, the scope of the search is limited by the terms of its authorization." *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 547 (6th Cir. 2003) (citation and internal quotation marks omitted). "[T]he scope of a search is generally defined by its expressed object and that the standard for measuring the scope of a suspect's consent under the Fourth Amendment is objective reasonableness - what would the typical reasonable person have understood by the exchange between the officer and the suspect?" (*United States v. Lucas*, 640 F.3d 168, 175 (6th Cir. 2011) (citation and internal quotation marks omitted). After giving consent, "the consenting party may limit the scope of that search, and hence at any moment may retract his consent," at which point the search must be immediately terminated. *Painter v. Robertson*, 185 F.3d 557, 567 (6th Cir. 1999) (citations omitted). Thus, even if consent had been initially given without any restriction,[30] Brent has provided evidence - unrebutted by the State Defendants - that he expressly revoked such consent by objecting to their venturing beyond the living room area of the home. Rather than terminating the search when Brent voiced his objection, as the Fourth

---

[30]This, too, is a questionable proposition. If, as Brent says, the "expressed object" of the visit was misrepresented, it is not clear that any consent would extend beyond the scope required to accomplish that expressed object. If the social workers had simply wished to ensure that RAB had not sustained any adverse health effects from his exposure to the cold weather, there would be no reason to leave the living room, to photograph the home, or to question the children about anything beyond RAB's health.

41

Amendment requires, the State Defendants allegedly told him that he had no choice but to allow them to go wherever they desired.

The State Defendants - citing to *Bills v. Aseltine*, 958 F.2d 697, 707 (6th Cir. 1992) - also argue that the taking of photographs in the Brent home does not constitute a cognizable seizure for Fourth Amendment purposes because it did not meaningfully interfere with any possessory interest. However, *Bills* actually points to directly the opposite conclusion. There, the court considered two sets of photographs: one that had been taken of items in plain view while the officer was lawfully in the residence and one that was taken by a private security officer who was not lawfully present. The court concluded that no violation had occurred with respect to the first set, but, "[o]n the other hand, the photographs taken by [the private security officer] are in a different category because . . . [he] was not lawfully on the premises. He had no right to the plain views he recorded by photography, and the officers had no authority to procure and permit his presence for purposes utterly unrelated to the execution of their warrant."[31] *Id.* at 707. Thus, in light of the genuine issue as to whether they exceeded the scope of consent, and thus whether their continued presence was lawful, the Court rejects their argument that the taking of photographs in the Brent home implicated no cognizable Fourth Amendment interest.

Brent has presented sufficient evidence to create a genuine issue of a material fact with regard to whether Wenk, Sampson, and Decormier-McFarland violated his Fourth Amendment rights, and - as the cases cited herein demonstrate - these rights were clearly established at the time

---

[31]The court did not ultimately resolve the question of whether the latter set constituted an unconstitutional seizure because that defendant had been dismissed from the case pursuant to a settlement agreement.

42

of the events in question.[32] Therefore, they are not entitled to the protections of qualified immunity with respect to these claims, and their request for summary judgment on these claims must be denied.

(c)    <u>Fourteenth Amendment (Parental Rights/Family Integrity)</u>

"It is clearly established that the Constitution recognizes both a protectible procedural due process interest in parenting a child and a substantive fundamental right to raise one's child." *Bartell*, 215 F.3d at 557. It is not clear whether the amended complaint asserts this claim under the procedural or substantive prong of due process analysis. However, reading the amended complaint in its most favorable light, the Court will assume that Brent intended to pursue this claim under both prongs.[33]

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Matthews v. Eldridge*, 424 U.S. 319, 332 (1976). Thus, a

---

[32]However, Brent has not presented any authority for the proposition that a parent's Fourth Amendment rights are violated when his child is subjected to unlawful interrogation. *See Alderman v. United States*, 394 U.S. 165, 174 (1969) ("Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted."). Although he cites *Doe v. Heck*, 327 F.3d 492 (7th Cir. 2003), it does not help him. There, the Seventh Circuit held that (1) a child who was seized for a custodial interview at a private school, and the private school that was subject to a warrantless search, each had their Fourth Amendment rights violated; and (2) the Fourteenth Amendment rights of the child's parents were violated when their child was subjected to a custodial interview without their knowledge or consent. The court did not hold that the parents had a valid Fourth Amendment claim with respect to the interviewing of their child. Therefore, the State Defendants are granted a summary judgment to the extent that Brent's Fourth Amendment claim is based upon a violation of his children's Fourth Amendment rights.

[33]The State Defendants have included both substantive and procedural due process analyses in their dispositive motion.

procedural due process claim requires a showing that (1) the plaintiff was deprived of a protected liberty or property interest, and (2) the deprivation occurred without due process of the law. *E.g.*, *Pittman*, 640 F.3d at 729. It is well-established that "the parent-child relation gives rise to a liberty interest that a parent may not be deprived of absent due process of law." *Kottmyer*, 436 F.3d at 689 (citing cases affirming constitutional rights to (1) maintenance of parent-child relationship; (2) companionship with children; and (3) make decisions regarding the care, custody, and control of their children).

To the extent that Brent's claim is based upon the removal of the children from his home, the State Defendants are correct that they cannot be held liable for any such deprivation because the Family Court - not the State Defendants - bore the ultimate responsibility for this decision. *See Pittman*, 640 F.3d at 729 (social worker-defendant not liable for deprivation of right to family integrity, under substantive or procedural due process analysis, where juvenile court ultimately made decision to grant custody to individuals other than plaintiff-father). "Because the [Family] [C]ourt has the ultimate decisionmaking power with respect to placement and custody, it alone could deprive [Brent] of his fundamental right" regarding the removal of his children. *Id.*

However, Brent correctly notes that not all of the deprivations about which he complains were caused by the orders from the Family Court. Although the Family Court was ultimately responsible for the removal of the children, Brent retained a protected liberty interest in the decisions that were made with respect to their care. It has been established since at least 1982 that "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they . . . have lost temporary custody of their child to the State." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982).

44

Brent identifies several specific instances in which the State Defendants deprived him of this interest prior to and after the removal of the children. For example, as noted above, *supra* note 30, a parent's Fourteenth Amendment rights may be violated by the interrogation of his child without his consent. *Doe*, 327 F.3d at 524. He also points to (1) various examinations and interventions that were conducted without his knowledge or consent and in the absence of any court order; (2) the refusal of several Defendants to seek or permit his input in decisions regarding his children's medical, educational, residential, and other needs; (3) the failure to advise him of decisions that had been made with respect to his children; (4) certain Defendants' insistence that - notwithstanding their conclusion that the home conditions were adequate and safe - they would recommend the children's return only if he would waive his right to a jury trial and give up all post-return decision-making authority with respect to their education, medical care, and extracurricular activities; and (5) the creation of a document that purported to appoint the Chinavares as the temporary guardians of the male children without parental consent or a court order. (*E.g.*, Am. Compl. ¶¶ VI.A.65-67, 69, 84 (Wenk); VII.A.6, 17, 29, 35 (Sampson); IX.A.10-13, 22, 27-30, 38, 41-42, 54-60, 62 (Trice); X.A.4-5, 8-10 (McGehee); XI.A.13 (Lamar)). Moreover, Brent alleges that these deprivations were effected without providing him *any* process, much less due process.[34] These allegations are sufficient to state a claim based on the Fourteenth Amendment. Moreover, Brent has attached affidavits that attest to these claims. The State Defendants have not denied the substance of these allegations. Instead, they maintain that *all* of Brent's claimed deprivations were

---

[34]Brent also advances a separate due process claim against McGehee for allegedly withholding certain documents from him and fabricating other documents. Insofar as the injury ultimately alleged is Brent's inability to fully participate in the decision-making process regarding his children, the Court interprets this claim as falling within his parental rights claim.

caused by the actions of the Family Court - not them. The Court disagrees. They have not pointed to any court order that required or permitted them to exclude Brent from the decision-making process regarding his children or to take the other complained-of actions.

The State Defendants also more generally argue that they cannot be held liable because their actions were taken "with the purpose of protecting [Brent's] children." (State Defs.' Mot. to Dismiss at 7). However, such a blanket assertion - untethered to Brent's specific allegations and lacking identified evidentiary support - does not demonstrate the absence of a genuine issue of a material fact. Brent has also plausibly alleged that discovery would yield additional evidence with respect to these allegations - evidence that he has been unable to gather or procure because of a prior order which stayed discovery pending the outcome of these motions. Having found that Brent has stated a cause of action and demonstrated a genuine issue of a material fact with respect to his procedural due process claims against Wenk, Sampson, Trice, McGehee, and Lamar, the Court must - at this stage - reject their assertion of qualified immunity.

Unlike a procedural due process claim, "substantive due process provides that, irrespective of the constitutional sufficiency of the processes afforded, government may not deprive individuals of fundamental rights unless the action is necessary and animated by a compelling purpose." *Bartell*, 215 F.3d at 557-58 (citing *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)). The interest that parents have in the care, custody, companionship, and control of their children  has been described as "an interest far more precious than any property right," *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981), and perhaps "the oldest of the fundamental liberty interests recognized by this Court," *Troxell v. Granville*, 530 U.S. 57, 65-66 (2000). Thus, there can be no doubt that the private interest asserted here is of the utmost importance However, as Brent

46

acknowledges, this interest "is limited by an equaling compelling governmental interest in the protection of children, particularly where the children need to be protected from their own parents." *Kottmyer*, 436 F.3d at 680.

As discussed above, Brent has sufficiently alleged and supported his claims that Wenk, Sampson, Trice, McGehee, and Lamar deprived him of his parental rights. Again, although these Defendants point to a generalized compelling state interest in protecting the Brent children, they have neither argued nor shown that the specific actions complained of furthered that interest in any way. Therefore, the Court concludes that the assertions of qualified immunity of Wenk, Sampson, Trice, McGehee, and Lamar with respect to Brent's substantive due process claim must, at this stage, be rejected.

(d)   <u>Fourteenth Amendment (Central Registry Claim)</u>

Brent's facial challenge to what he deems to be the constitutional defects within the Central Registry system was levied only against the Michigan DHS, which has been dismissed as a Defendant due to its Eleventh Amendment immunity. Thus, what remains are Brent's claims against Wenk and Sampson that his placement on the Central Registry violated a procedural or substantive due process right.

As detailed above, a predicate to establishing either claim is a showing that he had a constitutionally cognizable liberty or property interest in not being so designated. But Brent has not provided any controlling authority which would suggest that the placement of his name on the Central Registry, by itself, implicates such an interest.[35] He points to his inability to participate in

---

[35]Although Brent has not hinged his claim on reputational damage as a result of his listing, the Court notes that reputational damage - standing alone - does not implicate a protected

certain roles - as a volunteer with the Civil Air Patrol,[36] as a foster or adoptive parent, as an employee or a volunteer in positions involving children - as a result of this listing. However, aside from the first-listed role, he has failed to advance even a speculative desire to do any of the things that he claims this listing would prevent him from doing. Moreover, he has not pointed to any authority that would support the proposition that the loss of his ability to participate in a volunteer capacity implicates a cognizable liberty or property interest - or, more to the point, that such an interest is clearly established. "Generally speaking, volunteers do not have property interests in their positions, and thus do not have a constitutional right to due process." *Baker v. McDaniel*, Nos. 07-379-KSF and 08-420, 2009 WL 2710099, at *4 (E.D. Ky. Aug. 23, 2009) (listing cases).

Moreover, even if the loss of a volunteer position did implicate a constitutionally cognizable interest, Brent has not shown that he was entitled to a pre-deprivation hearing with respect to these roles. And, to the extent that any constitutional deprivation had occurred, Brent concedes that he was afforded a post-deprivation hearing. Indeed, he represents to the Court that he is pursuing precisely those post-deprivation remedies that the law allows.

For all of these reasons, the Court concludes that Brent has not suffered the deprivation of any clearly-established liberty or property interest without adequate process. Inasmuch as Brent has been unable to overcome the assertion of qualified immunity with respect to this claim, and because any additional discovery could not remedy its fundamental defects, Wenk and Sampson are entitled to a summary judgment on his due process claims related to his listing on the Central Registry.

_____

due process interest. *Paul v. Davis*, 424 U.S. 693, 712 (1976).

[36]The Civil Air Patrol is the volunteer, non-profit auxiliary of the United States Air Force. 10 U.S.C. § 9442.

    (e)    <u>Retaliation</u>

Brent contends that some of the State Defendants (Wenk, Trice, McGehee, and Lamar) took adverse actions against him in retaliation for his decision to exercise his constitutionally-protected right to trial. (*See* Am. Compl. ¶¶ VI.A.81, 84, 85, 91; IX.A.31, 35, 36, 48, 58, 59; X.A.12; XI.A.10).[37] "It is well established that government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." *Thaddeus-X v. Blatter*, 175 F.3d 378, 386 (6th Cir. 1999). To establish such a claim, a plaintiff must show that "[he] engaged in conduct protected by the Constitution or by statute, the defendant took an adverse action against the plaintiff, and this adverse action was taken (at least in part) because of the protected conduct." *Id.* at 386-87. The Sixth Circuit further explained that the adverse action must be "one that would deter a person of ordinary firmness from the exercise of the right at stake." *Id.* at 398 (citation and internal quotation marks omitted).

As for the first prong, Brent states - and the evidence reflects - that he was engaged in the protected activity of insisting on a jury trial to contest the allegations of neglect. The Defendants do not deny that availing oneself of such process is a protected due process right. As for the second prong, Brent alleges that these Defendants (1) refused to allow the children to return home despite the conclusion - withheld from the Family Court - that the inadequacies of their home, if any, had

---

[37]The Court notes that it is only with respect to the causes of action which have been alleged against Lamar that Brent specified an independent claim for retaliation. However, the identified paragraphs of the amended complaint clearly indicate that Brent levied the same accusation against Wenk, Trice, and McGehee. Moreover, the State Defendants have responded to this allegation en masse, rather than simply on behalf of Lamar. Therefore, the Court will consider this claim as it relates to all State Defendants against whom it has plausibly been alleged.

been remedied; and (2) denied him the right to be involved in the decision-making process regarding his children. Certainly, put to the choice between, on the one hand, having his children returned home and being able to exercise his parental rights with respect to them, and, on the other hand, being able to challenge the underlying neglect allegations by jury trial, a person of ordinary firmness could easily be deterred from the latter to ensure the former. As noted above, *supra* Part IV.F.1.c, Brent has shown, at least, that a genuine issue of a material fact exists regarding these allegations. With respect to the third prong - put another way, whether Brent was actually put to this choice - the Court concludes (although, again, it is a close call) that he has sufficiently alleged that the adverse actions were causally related to the exercise of his protected rights. Although a jury may ultimately decide that the delay in the return of his children and the inability to exercise his parental rights was unrelated to his refusal to waive his trial rights, it may well decide the opposite. Indeed, it might surmise that the refusal to return his children even months after the Brent home had been deemed to be safe and adequate was due entirely to his refusal to accept a plea bargain by which he would admit to neglect in favor of contesting that very conclusion. At least in this stage of the proceedings, and without the benefit of full discovery, Brent has met his burden. The Court denies the State Defendants' motion to dismiss and/or for summary judgment with respect to this claim.

(2)   Municipal Liability

To establish municipal liability against the Wayne DHS,[38] Brent must show that the alleged

---

[38]Although the Wayne DHS has argued that, as an agency of the State, it is not a "person" subject to liability under § 1983, *see Will v. Mich. Dep't of State Police*, 491 U.S. 58,66 (1989), as noted *supra* Part IV.D, the Wayne DHS has provided no evidence or argument that it is a state, rather than a county, entity. Therefore, the Court finds that the Wayne DHS is a "person" for § 1983 purposes, and that it is amenable to a lawsuit for its own constitutional torts - though

constitutional violations were inflicted pursuant to a governmental custom, policy, or practice. *Monell v. N.Y. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."). Because a municipality cannot be held liable on the basis of vicarious liability or respondeat superior, a complainant must show that "deliberate action attributable to the municipality directly caused a deprivation of federal rights." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 415 (1997).

To the extent that Brent's allegations against the Wayne DHS attempt to impose vicarious liability on it for the acts of individual - though unnamed - employees, they are barred. A § 1983 litigant cannot avoid the vicarious liability bar by simply naming the municipal entity rather than the individual employees of that entity. In the absence of any allegation or argument that the employees' actions were the result of a Wayne DHS policy, practice, or custom, this municipal entity cannot be held liable under § 1983 with respect to this type of allegation. However, to the extent that Brent has pointed to this conduct to demonstrate the effect of the Wayne DHS policies, practices, or customs, they will be considered.

Brent's § 1983 claims against the Wayne DHS are based upon alleged violations of his rights under the Second, Fourth, and Fourteenth Amendments (familial integrity and substantive and procedural due process with respect to his placement on the Central Registry). As Brent has not shown any constitutional violation regarding his claims based on (1) the Second Amendment

---

not, of course, for those of its employees on a respondeat superior theory of liability. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978)

and (2) procedural and substantive due process related to his listing on the Central Registry, Brent necessarily cannot establish a *Monell* claim against the Wayne DHS for these alleged violations. Therefore, a summary judgment is entered in its favor on Brent's § 1983 claims that are based upon the Second Amendment and his listing on the Central Registry.

However, Brent has plausibly alleged that the violations of his Fourteenth Amendment parental rights and Fourth Amendment rights resulted from a policy, practice, or custom of the Wayne DHS. (*E.g.*, Am. Comp. ¶¶ V.A.4, 7, 12-13, 17, 20-22; VII.A.3). Therefore, the request of the Wayne DHS for a dismissal for failure to state a claim under Rule 12(b)(6) is denied. The Court also concludes that Brent is entitled to discovery from the Wayne DHS before the Court rules on its request for a summary judgment. Because the Wayne DHS is not entitled to assert any personal immunities, *see, e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 167 (1985) ("In an official-capacity action, [personal immunity defenses such as qualified and absolute immunity] are unavailable. The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment." (citations omitted)), the rationale for staying discovery in this case until the threshold qualified immunity issue was resolved (*see* Order, Oct. 5, 2011, ECF No. 107) does not apply to this municipal entity. Therefore, the Court denies the request by the Wayne DHS for the entry of a summary judgment with respect to Brent's *Monell* claims based upon the alleged violations of the Fourth Amendment and his parental rights under the Fourteenth Amendment - but does so without prejudice to its ability to file a renewed motion for summary judgment after the completion of discovery.

G.      § 1985 Conspiracy Claims

Brent alleges that each of the Defendants, with the exception of the Michigan DHS, is liable

under 42 U.S.C. § 1985 for conspiring with others to violate his constitutional rights. Although it is not clear from his amended complaint, Brent has clarified in his briefing that he intended to bring claims under § 1985(2) (providing a right to damages "if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws) and § 1985(3) (providing a right to damages "[i]f two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws").

Under either section, the elements of a § 1985 claim are "(1) a conspiracy involving two or more persons, (2) for the purpose of depriving, directly or indirectly, a person or class of persons the equal protection of the laws and (3) an act in furtherance of that conspiracy (4) that causes injury to person or property, or a deprivation of a right or privilege of a United States citizen." *Taylor v. Streicher*, 465 F. App'x 414, 419 (6th Cir. 2012) (citations omitted) (§ 1985(2) claim); *Collyer v. Darling*, 98 F.3d 211, 233 (6th Cir. 1996) (citations omitted) (§ 1985(3) claim). "[T]he Supreme Court [has] noted that § 1985(3) was not 'intended to apply to all tortious, conspiratorial interferences with the rights of others' and held that the language in § 1985(3) 'requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.'" *Warner v. Greenebaum, Doll & McDonald*, 104 F. App'x 493, 497-98 (6th Cir. 2004) (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 101-02 (1971)); *see also Bartell v. Lohiser*, 215 F.3d

550, 559-60 (6th Cir. 2000) (quoting *United Brotherhood of Carpenters & Joiners of Am. v. Scott*, 463 U.S. 825, 829 (1971)). "[T]he class of individuals protected by the 'equal protection of the laws' language of the statute are those so-called 'discrete and insular' minorities [who] receive special protection under the Equal Protection Clause because of inherent personal characteristics. The persons protected under the 'equal privileges and immunities' language of the statute are those individuals who join together as a class for the purpose of asserting certain fundamental rights. *Browder v. Tipton*, 630 F.2d 1149, 1150 (1980); *see also Bartell*, 215 F.3d at 560; *Haverstick Enters., Inc. v. Fin. Fed. Credit, Inc.*, 32 F.3d 989, 994 (6th Cir. 1994) ("A class protected by section 1985(3) must possess the characteristics of a discrete and insular minority, such as race, national origin, or gender."). The Supreme Court has noted that a claim under the second clause of § 1985(2) - relating to actions in state courts, and under which Brent's claim is brought - requires the same showing of racial or class-based discriminatory animus as required under § 1985(3) because each requires a showing that the conspirators acted with intent to deprive the plaintiff of equal protection of the laws. *Kush v. Rutledge*, 460 U.S. 719 (1983); *see also Molnar*, 574 F. Supp. 2d at 788 and n.10 (distinguishing first clause of § 1985(2) - which deals with obstruction of justice in federal courts and does not require a showing of discriminatory animus - from second clause - which deals with conspiracies in state-court actions and does require such showing). "[C]onspiracy claims must be pled with some degree of specificity and . . . vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim." *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 832 (6th Cir. 2007) (citation and internal quotation marks omitted).

In his responses to the dispositive motions, Brent has claimed membership in numerous

"classes" that, he believes, satisfy this requirement. These purported classes are those who (1) have

Native American ancestry; (2) have temporarily lost physical custody of their children to the state;

(3) own guns; (4) are parents who exercised their right to trial; or (5) home school their children.

Leaving aside for a moment the first-listed class, none of the remaining four are the types of classes

that are protected by § 1985.  They are not "discrete and insular minorities" as required under

*Haverstick*, and Brent has not alleged that he joined together with others for the purpose of

asserting the listed rights. As noted above, § 1985 was not "intended to apply to all tortious,

conspiratorial interferences with the rights of others," *Griffin*, 403 U.S. at 101, and these claims

plainly fall outside the scope of conduct that § 1985 covers. These purported classes are analogous

to the class of women seeking to exercise their constitutional right to abortion that the Supreme

Court found not to constitute a class protected by § 1985(3) because the term "protected class"

"unquestionably connotes something more than a group of individuals who share a desire to engage

in conduct that the § 1985(3) defendant disfavors." *Bray v. Alexandria Women's Health Clinic*, 506

U.S. 263, 269 (1993). Thus, any conspiracy, assuming that one had been properly alleged, on the

basis of these classes cannot support a § 1985 claim. These allegations are thus dismissed for failure

to state a claim.

  As to the first class, Brent is correct that discriminatory animus on the basis of his Native

American ancestry could support a claim under § 1985. At most, however, he claims that some of

the Defendants failed to comply with the requirements of the Indian Child Welfare Act ("ICWA")[39]

and associated DHS policies. A violation of this law and this policy - however egregious - does

---

  [39]Although Brent has not brought a free-standing claim pursuant to the ICWA, the
material submitted by him suggests that he is pursuing this issue in the state courts.

not, standing alone, establish that the Defendants conspired to violate his equal protection rights, or that any conspiracy was motivated by animus toward his Native American heritage. If it was otherwise, every single violation of the ICWA or an associated policy would support a conspiracy claim under § 1985. Brent has not presented any authority for such a proposition. Stated otherwise, Brent has essentially alleged that (1) the Defendants conspired to deprive him of equal protection, *and* (2) he has Native American ancestry. Even assuming that Brent had established that a conspiracy existed, he has utterly failed to show that the Defendants conspired to deprive him of equal protection *because of* his Native American ancestry. Therefore, this allegation must be dismissed for failure to state a claim.

Because Brent's § 1985 claims must fail, so must his § 1986 claim against Trice. 42 U.S.C. § 1986 ("Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured , or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented."); *White v. Trapp*, 93 F. App'x 23, 26 (6th Cir. 2004) ("Section 1986 creates a cause of action for a defendant's knowing failure to prevent a § 1985 conspiracy. Where a plaintiff has stated no cause of action under § 1985, no cause of action exists under § 1986."); *Browder*, 630 F.2d at 1155; *Willing v. Lake Orion Community Schs. Bd. of Trustees*, 924 F. Supp. 815, 819 (E.D. Mich. 1996) ("[Section 1986] only provides a cause of action for damages against any person who neglects to prevent the conspiracies described in section 1985. The existence of a conspiracy actionable under § 1985, therefore, is an indispensable prerequisite to a section 1986 claim."). Accordingly, Brent's

56

§ 1986 claim against Trice must be, and is, dismissed because of his failure to state a claim.

H.     State Tort Claims

Brent has accused the Wayne DHS, Wenk, Sampson, Trice, McGehee, Lamar, Methodist Children's Home, and the Children's Center of gross negligence and intentional infliction of emotional distress ("IIED"), and the Judson Center and Greene of IIED.[40]

All tort claims against the Wayne DHS are barred by the Michigan Government Tort Liability Act ("GTLA"), Mich. Comp. Laws § 691.1401 et seq. As it relates to governmental agencies, the GTLA provides that "[e]xcept as otherwise provided in this act, a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function." The Wayne DHS is a governmental agency, Mich. Comp. Laws § 691.1401(a) ("'Governmental agency' means this state or a political subdivision."); *id.* § 1401(e) ("'Political subdivision' means a . . . county . . . ; or an agency, department, court, board, or council of a political subdivision."), and it was discharging its governmental function of investigating and responding to neglect allegations, *id.* § 1401(b) ("'Governmental function' means an activity that is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law."); *see also, e.g.*, *McCarthy v. Scofield*, No. 284129, 2009 WL 3235639, at *3 (Mich. Ct. App. Oct. 8, 2009) (unpublished) (county DHS entitled to immunity from

―――――――――――――――

[40]Brent has also alleged a claim against Trice whom he believes is liable under Mich. Comp. Laws § 722.633(1) ("A person who is required by this act to report an instance of suspected child abuse or neglect and who fails to do so is civilly liable for the damages proximately caused by the failure.") for her alleged failure to report suspected medical neglect of RAB. Although the State Defendants request a dismissal and/or a summary judgment with respect to Brent's entire amended complaint, Trice has not made any argument specifically regarding this claim. Therefore, and in the absence of any argument or briefing by the parties, this claim will proceed.

all tort claims because it was discharging its governmental function of investigating reports of child abuse). "[T]o determine whether a governmental agency is engaged in a governmental function, the focus must be on the general activity, not the specific conduct involved at the time of the tort." *Tate v. City of Grand Rapids*, 671 N.W.2d 84, 87 (Mich. Ct. App. 2003) (citation and internal quotation marks omitted). Because all tort claims are barred as against the Wayne DHS, the Court enters a summary judgment in favor of this governmental agency with respect to Brent's gross negligence and intentional infliction of emotional distress claims.

Under Michigan law, "[s]ocial workers are granted absolute immunity from civil litigation arising out of their work as 'advisors and agents' of the probate court (now to the family division of circuit court) because that court provides parents and other interested parties with a sufficient remedy for any wrongful action by a social worker." *Beauford v. Lewis*, 711 N.W.2d 783, 786 (Mich. Ct. App. 2005). This protection is not limited only to governmental defendants, *see Martin v. Children's Aid Soc'y*, 544 N.W.2d 651, 655 n.5, and has been extended to individual social workers as well as to the entities that employ them, *id.* (granting absolute social worker immunity to Children's Aid Society and its employees); *see also Herman-Muhammad v. White & White Pharmacy, Inc.*, No. 270987, 2007 WL 678645, at *9-10 (Mich. Ct. App. Mar. 6, 2007) (social services agency and its employees entitled to social worker immunity). Thus, as with absolute social worker immunity in the § 1983 context, any conduct related to the filing of petitions or reports, or the giving of testimony or recommendations, in the Family Court cannot form the basis of a state tort claim. Conduct outside of those boundaries, however, is not protected by this immunity. With these principles in mind, the Court will now examine Brent's state tort claims against the various Defendants.

58

(1)      <u>Intentional Infliction of Emotional Distress</u>

(a)      <u>State Defendants</u>

Brent's IIED claims against the individual State Defendants are based on the following alleged conduct: (1) Wenk: wilfully acting to remove the children from the Brent home without cause and engaging in a conspiracy to deprive him of his association with his children in retaliation for exercising his rights; (2) Sampson: engaging in a fishing expedition and conspiracy to remove his children without cause and in retaliation for exercising his rights; (3) Trice: unlawfully withholding custody of his children despite knowing that there was no risk of harm at their home; (4) McGehee: maliciously taking his children hostage; and (5) Lamar: forcibly and intentionally breaking up his family without regard for his rights. These are essentially the same allegations upon which Brent's Fourteenth Amendment parental rights claims were based.

The State Defendants argue that they are entitled to qualified immunity with respect to Brent's intentional tort claims. In *Odom v. Wayne County*, 760 N.W.2d 217, 223 (Mich. 2008), the Michigan Supreme Court noted that the governmental immunity statute, Mich. Comp. Laws § 691.1407(3), explicitly states that "Subsection (2) does not alter the law of intentional torts as it existed before July 7, 1986." It thus reaffirmed the pre-1986 governmental immunity test as it applies to intentional tort cases. 760 N.W.2d at 228. To fall within the protection of governmental immunity, a lower ranking government official or employee must show that:

(a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,

(b) the acts were undertaken in good faith, or were not undertaken with malice, and

(c) the acts were discretionary, as opposed to ministerial.

*Id.* at 228. Unlike qualified immunity in the § 1983 context - where the plaintiff bears the burden of overcoming a defendant's assertion of qualified immunity, *O'Malley*, 2011 WL 3055227, at *2 - a defendant has the burden of proving an entitlement to qualified immunity under Michigan law. *Id.* at 227-28 (individual government employee - as opposed to governmental agency - who seeks the protection of governmental immunity bears the burden of raising and proving his entitlement thereto).

The first element is meant to ensure that an employee will not be immune from liability for any ultra vires conduct, but will be protected if and when he has a justifiable belief - even if he is subsequently determined to have been mistaken - that he was authorized to undertake such an action. *Id.* at 224. The Court has already determined that Brent has, at minimum, shown that a genuine issue of a material fact exists as to whether Wenk, Sampson, Trice, McGehee, and Lamar violated clearly established parental rights under the Fourteenth Amendment. Therefore, with respect to these actions, the Court cannot conclude that these Defendants had a reasonable belief that they were acting within the scope of their authority. *Cf. Thornton v. Fray*, 429 F. App'x 504, 511 (6th Cir. 2011) ("To the extent the length of the seizure and the use of force did not violate clearly established Fourth Amendment law, the officers could also reasonably believe that they were acting within the scope of their authority for purposes of governmental immunity under state law."). Because these Defendants cannot make out the first required element, the Court must, at this stage, reject their assertion of governmental immunity with respect to Brent's IIED claims. The Court thus turns to the merits of these claims.

Under Michigan law, the tort of IIED "has four elements: (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Haverbush v.*

*Powelson*, 551 N.W.2d 206, 209 (Mich. Ct. App. 1996) (citations omitted). The standard on such a claim is extremely high: "Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities," *Doe v. Mills*, 536 N.W.2d 824, 833 (Mich. Ct. App. 1995), but instead "has been found only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community," *id.* "The 'intent or recklessness' requirement refers to the intention of inflicting emotional distress, rather than merely intending the action that caused the distress." *Kolley*,786 F. Supp. 2nd at 1297-98. It is not enough that "'the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.'" *Roberts v. Auto-Owners Ins. Co.*, 374 N.W.2d 905, 908 (Mich. 1985) (quoting Restatement (Second) of Torts § 46 cmt. d)).

As noted above, the State Defendants are entitled to absolute social worker immunity with respect to any conduct in their capacities as advisors or agents to the Family Court. And, as with Brent's due process claims, the Family Court - not the State Defendants - ultimately caused the removal of the Brent children. Thus, the Court will not consider these allegations in assessing the IIED claims.

Although many of Brent's remaining allegations fail to rise to the level of outrageous conduct, the Court concludes that several of his allegations do state a claim for IIED. The essence of these allegations is that the State Defendants, despite having no actual belief that the Brent children were exposed to any harm in the home, nevertheless undertook a campaign to discover -

or even fabricate - damaging evidence so as to get the children removed, and then, having accomplished that purpose, used the return of the children as collateral to coerce Brent to relinquish his parental authority. For example, Brent alleges that (1) Wenk, with Sampson's approval, continued her investigation of the Brent family, notwithstanding their conclusion that the initial complaint was unsubstantiated, (2) Wenk and Sampson conducted this investigation having already predetermined the outcome and falsified various reports to support this outcome; (3) Wenk, Trice, McGehee, Lamar, and Sampson refused to explain what services were being offered to the Brent family or what harm, if any, the children faced in the absence of those services; (4) Wenk, Trice, McGehee and Sampson withheld information from Brent and refused to permit him to have any input regarding what was best for the family; (5) Wenk abused her authority to force her will upon the parents upon threat of the children not returning or being removed again after their return; (6) Wenk, Sampson, and Lamar refused to advise Brent what he needed to do to facilitate the return of his children; (7) Wenk coerced Brent into turning over all post-return decision-making authority with respect to the children's education, medical care, and extracurricular activities by threatening that the children would otherwise not be permitted to return; (8) Sampson and Lamar refused to respond to or investigate Brent's claims regarding constitutional, statutory, and policy violations; (9) despite having determined that the home was suitable for the children's return, Trice, Lamar, and McGehee held the children hostage to coerce the Brents to forfeit their right to trial and falsified various documents to justify not returning the children; (10) Trice refused to provide services to reunify the family, notwithstanding the review board's conclusions that the medical and educational needs of the children were not being met during their removal and that they should be returned to the Brent home. Brent also alleges that these actions were taken with reckless disregard for their

62

effect on him, and caused him extreme emotional distress. Taking all of these allegations as true and construing them in the light most favorable to Brent, *Bennett*, 607 F.3d at 1091, the Court concludes that they are sufficient to state a claim for IIED against Wenk, Sampson, Trice, McGehee, and Lamar, and their motion to dismiss is denied. Moreover, the affidavits that have been submitted by him demonstrate that a genuine issue of a material fact exists with respect to these claims.

As with Brent's *Monell* claims, the Court believes that, because (1) the assertion of immunity has been rejected; and (2) he has stated a claim for IIED and shown that a genuine issue of a material fact exists with respect to it, Brent is entitled to conduct discovery on this claim. Therefore, these Defendants' request for a summary judgment regarding Brent's IIED claims is denied, without prejudice to their ability to reassert this request upon the completion of discovery.

(b)      Non-State Defendants

Brent's claim against Methodist is based upon allegations that Methodist Children's Home staff (1) provided improper and inadequate medical care to RAB, and (2) drove slowly past his home with JAB (male) as a passenger for no apparent purpose.[41]

With respect to the first basis, Brent alleges that (1) a nurse gave RAB some cough drops that had expired eighteen months prior; (2) RAB was not permitted to see a nurse for some number of hours after his throat condition had worsened; (3) RAB left the facility and walked by himself to a nearby hospital where he was diagnosed with acute bronchitis and acute pharyngitis; and (4)

---

[41]As Methodist Children's Home correctly points out, the amended complaint does not connect the former allegation to his IIED claim. The only reference to the infliction of emotional distress in the amended complaint is in connection with the latter allegation. However, in light of Brent's pro se status, out of an abundance of caution, and rather than requiring Brent to file a second amended complaint, the Court will consider both allegations.

Methodist Children's Home refused RAB's and Brent's requests to have RAB examined by a physician. While all of these allegations, if true, are certainly troubling, they cannot, as a matter of law, sustain an IIED claim for several reasons. First, the Court does not believe that they rise to the level of being "atrocious" or "utterly intolerable in a civilized community." Second, and more importantly, there is absolutely no basis to conclude that these actions were taken with the requisite intent to cause - or recklessness as to whether they would cause - Brent, as opposed to RAB, extreme emotional distress. Third, Brent has not alleged or shown that these actions did, in fact, cause him severe emotional distress. The Court, of course, recognizes that Brent, like any loving parent, would be distressed to learn that his child received inadequate medical care. However, that is not enough; "[t]he law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." *Haverbush*, 551 N.W.2d at 209 (citation and internal quotation marks omitted). He has not come close to making this showing.

The outcome is the same with respect to the alleged drive-by of his home. Assuming that this event took place - something that the Methodist Children's Home denies - it falls far short of the "extreme or outrageous" standard. Moreover, Brent has not alleged that he even witnessed this event, and, if he did, that it caused him to suffer severe emotional distress. Brent's IIED claim against the Methodist Children's Home is dismissed for failure to state a claim.

Brent's IIED claim against the Judson Center and Greene is based on his allegations that (1) the Judson Center sent employees to the Brent home on February 16, 2010, despite having been told that they could not come that day but could come the following day instead; and (2) Greene, in her roles as a counselor for Brent's daughters and as the team leader for the Family Reunification Program, forced counseling services upon his daughters beyond those ordered by the Family Court

and attempted to cause problems among the family members.[42]

The first basis plainly fails to reach the "outrageous" threshold. Even if this unannounced visit was "confrontational at best" (Am. Compl. ¶ XIV.A.14) and an "unwarranted trespass" (*id.* ¶ 16), there is no set of facts that would make this visit "utterly intolerable" or "atrocious." Nor has Brent alleged or shown that the intent of this visit was to cause him severe emotional distress, or that it, in fact, did so. At most, he alleges an intent to create a "conflict" or "hostile encounter" - neither of which approaches an intent to cause "severe emotional distress." This allegation fails to state a claim for IIED.

The same is true with respect to the claim that Greene forced unwarranted and unordered counseling services upon his daughters. Although these services may well have gone beyond the scope of the court-ordered counseling - which related solely to the counseling required to determine parental visitation time - it cannot be said that an attempt to convince Brent to authorize additional counseling was outrageous (whether based on a mistaken belief or an outright lie that such counseling was court-ordered), or that such an attempt was intended to - and did - cause him severe emotional distress. Brent also claims that Greene attempted to coerce his daughters into accepting these counseling services by telling them that, if they did not, "it will be harder for you to go home." However, this argument fails because (1) the emotional distress, if any, would have been visited upon his daughters, who are not parties to this litigation; and (2) the expressed purpose of these counseling services was to make the transition back home easier for the daughters. There is nothing outrageous or atrocious about that.

---

[42]In the amended complaint, Brent did not identify Greene's pre-reunification conduct as a basis for his IIED claim. However, for the same reasons noted above, *supra* note 41, the Court will nevertheless consider this allegation here.

65

However, a different result obtains with respect to Brent's allegations with respect to Greene's conduct after the Brent children had returned home. He alleges (and has submitted affidavits that aver) that, upon arrival at the Brent home, Greene first attempted to convince the family to place the blame for the children's removal squarely on RAB, then threatened the Brent parents that, if she was not permitted to speak to the children outside of their presence, the children would again be removed. He further alleges that Greene persisted in an attempt to get the children to state that they did not want to live with their parents, and then tried to create discord between the parents. All of this was done, Brent alleges, despite the fact that Greene should not have been their post-reunification team leader because a clear conflict of interest existed in light of her prior involvement as his daughters' counselor. Brent states that he repeatedly requested that Greene be removed from his family's case, but that the Judson Center refused these requests. Although it is a close call, the Court believes that a reasonable jury could find that these allegations regarding Greene, if believed, were outrageous and, at minimum, were carried out with recklessness as to the severe emotional distress that they may cause, especially in light of the trauma of prolonged separation the family had recently endured. Although these allegations have been emphatically denied, it is for the jury to determine whether to credit them, and, if it does, whether the conduct is extreme and outrageous. *Helfinger v. Bad Axe Public Schs.*, No. 294752, 2011 WL 118772, at *5 (Mich. Ct. App. Jan. 13, 2011) ("Whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery is a question of law for the court. If reasonable minds could differ on the subject, the issue becomes a question of fact for the jury." (citing *Lewis v. LeGrow*, 670 N.W.2d 675 (Mich. Ct. App. 2003)). Thus, the IIED claim against Greene based upon her post-reunification conduct will be permitted to go forward.

66

However, as it relates to the Judson Center, this claim must be dismissed. With respect to this Defendant, Brent claims only that the Judson Center did not remove Greene from the Brent case despite his repeated requests that it do so. This - standing alone - cannot be deemed to be outrageous or utterly intolerable conduct. Therefore, Brent's IIED claim is dismissed as to the Judson Center in its entirety.

The allegations regarding the Children's Center are similar to those regarding Greene. Brent alleges (and has submitted affidavits that aver) that its employee told the Brent parents - in the presence of the children - that they would accept a plea deal rather than exercising their right to trial if they really loved their children. Furthermore, Brent alleges that, after he and his wife refused to admit to false allegations, the Children's Center - despite his objections, as well as the objections of his wife, his daughters, and the daughters' foster parent - suspended all of telephone contact with his daughters. Again, in light of the trauma of separation that the family was already experiencing and their vulnerability in the face of the power that the Children's Center had to affect the outcome of this matter, a reasonable jury - if it credited this account of events - could conclude that this conduct was outrageous and was done with, at least, some level of recklessness with regard to the severe emotional distress that it may cause to the Brent family. Therefore, a dismissal or a summary judgment on this claim would be inappropriate.

     (2)    <u>Gross Negligence</u>

          (a)    <u>State Defendants</u>

Wenk, Sampson, MeGehee, Trice, and Lamar assert that Brent should be precluded from pursuing his gross negligence claims because governmental immunity shields them from prosecution. It is their contention that they have satisfied all of the requirements of Michigan's

67

governmental immunity for tort liability statute, which provides, in relevant part, as follows:

> Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question, each officer and employee of a governmental agency . . . is immune from tort liability for an injury to a person or damage to property caused by the officer [or] employee . . . while in the course of employment or service . . . if all of the following are met:
>
> (a) The officer [or] employee . . . is acting or reasonably believes he or she is acting within the scope of his or her authority.
> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.
> (c) The officer's [or] employee's . . . conduct does not amount to gross negligence that is the proximate cause of the injury or damage.

Mich. Comp. Laws § 691.1407(2). Gross negligence, in turn, is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." *Id.* § 1407(7)(a).

Finally, under the law in Michigan, "[a]n employee's conduct is 'the proximate cause' of an injury if it is 'the one most immediate, efficient, and direct cause preceding an injury.'" *Bennett v. Krakowski*, 671 F.3d 553, 560 (6th Cir. 2011) (quoting *Robinson v. City of Detroit*, 613 N.W.2d 307, 317 (Mich. 2000)).

The Court need not go beyond an analysis of the third factor to determine that, at this stage of this case, these Defendants are not entitled to governmental immunity. For essentially the same reasons as discussed in connection with Brent's Fourth Amendment, Fourteenth Amendment, and IIED claims, the Court concludes that he has stated a claim for gross negligence. As with Brent's IIED claim, the Court believes that, inasmuch as (1) the State Defendants cannot establish this necessary element of the immunity test, their assertion of governmental immunity must be rejected, and (2) Brent has stated a claim for gross negligence and shown that a genuine issue of a material

68

fact exists with respect to it, he is entitled to conduct discovery on this claim. Therefore, these Defendants' request for the entry of a summary judgment regarding Brent's gross negligence claims is denied without prejudice to their ability to reassert this request upon the completion of discovery.

        (b)    <u>Non-State Defendants</u>

Brent asserts two main bases for his contention that the Methodist Children's Home is liable for gross negligence. In support of this position, he maintains that this Defendant (1) failed to ensure that his statutory and constitutional rights were not violated; and (2) provided grossly negligent medical care to RAB, as well as grossly negligent educational care to the three male children. As for the first basis, the Court has already determined that the Methodist Children's Home is not a state actor, and Brent has not presented any authority for the proposition that, as a non-state-actor, it had a duty to protect his constitutional and statutory rights. Absent such a duty, there can be no cognizable negligence claim.

As for the second basis, to the extent that the alleged injury is the lack of care provided to his children, Brent has not cited any authority for the proposition that a parent can sustain a negligence claim based on claimed injuries that were sustained by his children. He also asserts that he personally suffered an injury in the form of mental anguish, fright, and other emotional harms as a result of the allegedly neglectful medical and educational care provided to his children. However, even if Brent had framed this claim as one for the negligent infliction of mental anguish, he has not shown, as required, that the "mental anguish was parasitic to, was caused by, or was the cause of a separate and independent injury. Recovery for a negligently inflicted mental disturbance generally requires an accompanying physical injury, illness or other physical consequences, or some other independent basis for tort liability." *Hayes v. Langford*, No. 280049, 2008 WL 5158896, at *4

(Mich. Ct. App. Dec. 9, 2008) (citations and internal quotation marks omitted). Under Michigan law, to prevail on a negligence claim, the plaintiff must demonstrate a physical injury to a person or property. *Stone v. Williamson*, 753 N.W.2d 106, 113 (Mich. 2008) ("[I]t has never been the law in this state that a negligence suit can be sustained when the alleged negligence did not cause a physical injury to a person or property."). Brent is correct that emotional damages are recoverable in tort claims - but he confuses the issues of injury and damages. Thus, even construing this claim liberally as one for the negligent infliction of mental anguish, the Court concludes that Brent has failed to state a claim that is actionable in law. Therefore, his gross negligence claim against the Methodist Children's Home is dismissed.

Brent also asserts that the Children's Center was "grossly negligent in [its] affirmative duty to help reunify the family." (Am. Compl. ¶ XV.B.3). The Children's Center has not responded to this claim on its merits. Rather, it argues only that this claim is precluded due to various forms of immunity. To the extent that the Children's Center attempts to assert immunities available to state actors, this argument must be rejected in light of the earlier conclusion by the Court that this Defendant is not a state actor. Although it is entitled to absolute social worker immunity under Michigan law, Brent's allegations against the Children's Center fall outside the scope of this immunity because they are unrelated to any action in the capacity of an agent or advisor of the Family Court. Thus, because the Children's Center is not immune from Brent's gross negligence claim, and inasmuch as it has not sought the entry of a dismissal or a summary judgment on any other ground, this claim will be permitted to proceed.

## V. Conclusion

For the reasons that have been set forth above, (1) Brent's motion for reconsideration (ECF

70

115) is denied; (2) Brent's motion to file supplemental authority (ECF 147) is granted; (3) Methodist Children's Home's dispositive motion (ECF 116) is granted; (4) the Judson Center and Greene's dispositive motion (ECF 117) is granted as to all claims with the exception of Brent's IIED claim against Greene; (5) the Children's Center's dispositive motion (ECF 118) is granted with respect to Brent's § 1983 claims and denied as it relates to his gross negligence and IIED claims; and (6) the State Defendants' dispositive motion (ECF 120) is granted in part and denied in part. The previously-entered stay of discovery with respect to the State Defendants is lifted as it pertains to all claims to which a dismissal or summary judgment has not been granted.

For the sake of clarity, the Court will identify with some specificity the claims that have been rejected, the bases for the rejection, and the claims that remain. However, even where certain claims are permitted to proceed, many of them are circumscribed by various forms of immunity and other legal conclusions noted throughout this opinion. Therefore, this summary should be understood as providing only the bare outlines of the dispositions of the various pending motions. To the extent that this summary is inconsistent, or is perceived to be inconsistent, with the text of this order, the text of the order should prevail.

1.   <u>Methodist Children's Home</u>: Brent's § 1985 and state tort claims are dismissed for his failure to state a claim, and a summary judgment is entered in favor of this Defendant with respect to Brent's § 1983 claims. Because this accounts for all pending claims against the Methodist Children's Home, it is no longer a party to this action.

2.   <u>Judson Center and Wendolyn Greene</u>: Brent's § 1985 claims and IIED claim against the Judson Center are dismissed because of Brent's failure to state a viable claim. A summary judgment is entered in favor of the Judson Center and Greene with respect to Brent's § 1983

claims. His IIED claim against Greene remains.

3.     Children's Center: Brent's § 1985 claim is dismissed for his failure to state a claim, and a summary judgment is entered in favor of this Defendant as it relates to his § 1983 claims. His IIED and gross negligence claims remain.

4.     Michigan DHS: A summary judgment is entered in its favor on all claims.

5.     Wayne DHS: Brent's § 1985 claim is dismissed for failure to state a claim, and a summary judgment is entered in this Defendant's favor on his state tort claims and § 1983 claims based on the Second Amendment and the Fourteenth Amendment with respect to the Central Registry. His official-capacity § 1983 claims pursuant to the Fourth Amendment and Fourteenth Amendment parental rights remain.

6.     Wenk: Brent's § 1985 claim is dismissed because of his failure to state a claim. A summary judgment is entered in this Defendant's favor as it is applied to Brent's § 1983 claims that are based the Second Amendment and the Fourteenth Amendment with respect to the Central Registry. Brent's individual-capacity § 1983 claims that are based on the Fourth Amendment, Fourteenth Amendment parental rights, and retaliation, as well as his state-law IIED and gross negligence claims, remain.

7.     Sampson: Brent's § 1985 claim is dismissed for failure to state a claim, and a summary judgment is entered in this Defendant's favor as it is applied to Brent's § 1983 claims based on the Fourteenth Amendment with respect to the Central Registry. His individual-capacity § 1983 claims that are based the Fourth Amendment and Fourteenth Amendment parental rights, as well as his IIED and gross negligence claims, remain.

8.  <u>Decormier-McFarland</u>: Brent's § 1985 claims are dismissed for failure to state a claim. His individual-capacity § 1983 claim based on the Fourth Amendment remains.

9.  <u>Trice</u>: Brent's § 1985 and § 1986 claims are dismissed for his failure to state a claim. His individual-capacity § 1983 claims that are based on Fourteenth Amendment parental rights and retaliation, as well as his state claims for IIED, gross negligence, and a violation of Mich. Comp. Laws § 722.633(1), remain.

10. <u>McGehee</u>: Brent's § 1985 claim is dismissed for failure to state a claim. His individual-capacity § 1983 claims based on Fourteenth Amendment parental rights and retaliation, and state claims for IIED and gross negligence, remain.

11. <u>Lamar</u>: Brent's § 1985 claim is dismissed for failure to state a claim. His individual-capacity § 1983 claims based on Fourteenth Amendment parental rights and retaliation, and his state claims for IIED and gross negligence, remain.[43]

Finally, the Court takes this opportunity to note that several of Brent's allegations, if true, are deeply troubling. His complaint paints a picture of a family ill-treated by state, county, and private entities that ostensibly exist to help and support - not break apart and jeopardize - families by providing them with the resources and tools that are needed by them to be safe, healthy, and united. Thus, to the extent that various immunities and other legal principles have precluded some of Brent's claims, it is not because the Court condones or otherwise approves of the alleged misconduct.

---

[43]As noted above, the Detroit Police Department and its named and unnamed individual officers have not filed any motion. Thus, the claims against them remain undisturbed by this order.

73

IT IS SO ORDERED.

Date: November 15, 2012                                       s/Julian Abele Cook, Jr.

                                                             JULIAN ABELE COOK, JR.

                                                             U.S. District Judge

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on November 15, 2012.

                                                             s/ Kay Doaks

                                                             Case Manager